Argued October 26, reversed and remanded December 8, 1965

## FURTADO ET UX *v.* GEMMELL ET UX
### 408 P. 2d 733

*Edward Joel Clark,* Pendleton, argued the cause for appellants. With him on the briefs were Edward J. Clark and Leeroy O. Ehlers, Pendleton.

*James C. Walton,* Pendleton, argued the cause for respondents. On the brief were Mosgrove, Walton & Yokom, Pendleton.

Before McAllister, Chief Justice, and Perry, Sloan, Goodwin, Denecke, Lusk and Schwab, Justices.

SCHWAB, J. (Pro Tempore).

This is an appeal by the plaintiffs from a decree of the circuit court which dismissed their suit for the rescission of a contract of sale whereby they undertook the purchase from the defendants of a machine shop business in Echo, Oregon. The complaint sought the desired relief upon charges of false representations.

On June 28, 1961, Mr. Gemmell listed the machine shop property for sale at a price of $14,800 with Ted Vaughn, a salesman for the Strout Realty organization. The listing agreement recited that the gross receipts for the twelve-month period preceding the listing were $26,250, and the net income from the same period some $16,000. The net income figure was false. The defendants' records show that the net income for the calendar year 1960 was $6,747.38, and for the calendar year 1961 was $3,998.16.

The listing agreement which was signed by Gemmell contained a representation by him that the listing

information which included the gross and net figures was correct and that he, Gemmell, had read and received a copy of the listing. Gemmell's testimony was nebulous as to whether or not the figures had actually been placed on the agreement prior to the time he signed it. Vaughn's testimony was that all of the figures had been placed on the listing agreement before Gemmell signed and that he had gotten the information from Gemmell.

Thereafter, the realty company advertised the business for sale and in its advertisement stated, "net income of $16,000 reported for a year's time." In due course this advertisement came to the attention of Mr. Furtado. At the time, the Furtados knew nothing about eastern Oregon. They lived in Patterson, California, which is 860 miles and about 14 hours driving time from Echo. Furtado was a mechanic earning about $7,000 a year and had formerly been a milker in a dairy. His formal education consisted of one year of high school and he had no bookkeeping or business experience. When he saw the advertisement, he wrote to Vaughn on May 18, 1962, and the correspondence which ensued resulted in trips by the Furtados to Echo in June and July of 1962. Furtado asked to see the books but was told that they were at the accountant's office and unavailable during the short time Furtado could be away from his job.

On July 28, 1962, the Furtados gave a check for $200.00 to Vaughn pursuant to the following:

"MEMO TO:      Manual Furtado and Ruth
  FROM STROUT REALTY AT:
                  DATE     7-28-      19 62
                  11.45 Am.
  Received by check $200 00 Earnest Money on

> Echo Shop Purchase, Bal Due when Patterson
> Calif house is sold
> /s/ Manuel J Furtado
> /s/ Ruth E. Furtado                    /s/ Ted Vaughn"

The Furtados had difficulty selling their house and on April 22, 1963 the Gemmells cancelled the listing with Vaughn. On the same day Gemmell and Vaughn split the $200.00 between themselves. Meanwhile, on February 8, 1963, Vaughn had written the Furtados saying that if they couldn't sell their house and close the deal soon he was afraid that Gemmell would withdraw the offer of sale and find a new buyer—and that this wouldn't be hard to do because Gemmell had been "awfully busy."

During the period between the time Vaughn's listing was terminated and the time the Furtados bought the business from the Gemmells, there were several conversations among the parties as to the income of the business. The testimony is vague as to just what financial information was given to the Furtados by the Gemmells, but the record clearly discloses that prior to the time the Furtados entered into possession of the business they were not given a bona fide opportunity to see the books and had been told nothing which led them to believe that the net income figure in the original advertisement was incorrect. On the contrary, on August 7, 1963, Mr. Gemmell wrote Mr. Furtado concerning details of closing and in this letter he said, "the business has picked up considerably every year. To be honest I feel I am a fool to even consider selling it."

In the summer of 1963 the Furtados finally succeeded in selling their California property. The conversations among the parties culminated with an earn-

est money agreement for the purchase of the business for $14,800, the original asking price, being signed on March 16, 1964. In the closing the Furtados were not represented by counsel. On April 1st, 1964, they took possession.

The Gemmells were plagued with numerous creditors and as a result were unable to promptly clear the title. Because of the problems connected with the title and their uneasiness concerning the small volume of business they did after taking over on April 1, 1964, the Furtados consulted an attorney of their own choosing for the first time on May 15, 1964. On May 23, 1964, they vacated the property and turned the key over to the defendants' attorney. On May 26, 1964, defendants' attorney turned over to Furtados' attorney the operating statements for the years 1962 and 1963, which showed a net income of $6,763.80 for 1962, and $7,609.69 for 1963. These figures had not been previously known to the Furtados. On June 1, 1964, they filed suit for rescission.

Defendants admit that the representation that the business had a net income of $16,000 for the twelve-month period prior to June of 1961 was false, but argue that the Furtados did not rely upon this representation and further that if they did, it was neglect on their part because they should have insisted on seeing the books. There is no evidence in the record to indicate that the Furtados did not assume that this representation was true.

> "Where fraud or misrepresentation is material with reference to a transaction subsequently entered into by a person deceived thereby, it is assumed in the absence of facts showing the contrary that it was induced by the fraud or misrepresentation." 2 Restatement, Contracts 915, § 479.

The uncontroverted facts are that rather than a business earning $16,000 in 1961 and doing better each year, the business in no year earned even half as much. Nothing more need be said about the materiality of the representation.

■ The trial court, in its memorandum opinion, characterized the Furtados as inexperienced in financial transactions and naive. This is not a situation in which the defendants and their agent were silent as to the net income of the business or in which the pertinent representation was in the form of an opinion. The representation was made as a statement of fact and it was false.

> "* * * It is wrong to lie, and a person who has thus set a trap for the other party cannot be heard to complain that the latter should not have walked into the snare. It better comports with common honesty to condemn falsehood as a means of constructing a contract." *Caples v. Morgan,* 81 Or 692, 702, 160 P 1154.

It may be stated as a broad generalization that there is a duty on the part of a representee to use some measure of protection and precaution to safeguard his interest. 23 Am Jur, Fraud and Deceit 960, § 155.

> "* * * Courts have differed somewhat in their application of this principle, but this court has approved the view that it is better to encourage negligence in the foolish than fraud in the deceitful." *Hansen v. Holmberg,* 176 Or 173, 184, 156 P2d 571.

■ Gemmell's testimony that he did not recall giving the $16,000 figure to Vaughn does not benefit the defendants. The misrepresentation was made and it was material. "* * * [A] material misrepresenta-

tion, although innocently made, may be grounds for rescission." *Brown et ux v. Hassenstab et ux,* 212 Or 246, 253, 319 P2d 929.

■ Defendants' contention that plaintiffs ratified the transaction has no merit. From the time plaintiffs took possession on April 1, 1964, indirect evidence began to accumulate tending to show that the business had been misrepresented—a paucity of customers and a multiplicity of creditors. The first concrete evidence of the extent of the misrepresentation consisted of the financial data turned over to their lawyer on May 26, 1964, less than one week before they filed the pending suit. The facts here are similar to *Brown et ux v. Hassenstab et ux,* supra. In that case the purchasers took over the business in October of 1952, discovered the fraud in mid-April of 1953, and tendered back the business on May 26, 1953. We there held that the plaintiffs seeking rescission had proceeded with reasonable promptness.

The defendants urge that plaintiffs' case must fail because they have not offered adequate proof of damage. They argue that a real estate appraiser's testimony at the trial that on an asset basis the business was worth substantially less than the purchase price of $14,800 has no relevance to the value of a going business; and further, that because the Furtados could testify only as to a gross income of between twelve and thirteen hundred dollars during the seven week period they operated the business and could not testify to the net profit, there is a complete failure of proof as to damage.

In support of this position defendants cite language in *Pace v. Edgemont Inv. Co.,* 138 Or 32, 35, 4 P2d 633: "In a suit for rescission, based on fraud, plain-

tiffs must allege and prove that they suffered damage or injury." An examination of that opinion shows that the court there actually held that there was no material misrepresentation, and that in any event there was ratification after the claimed misrepresentation had come to the attention of the parties seeking rescission.

■ In a suit for rescission based on misrepresentation as distinguished from an action for damages it is not necessary to prove pecuniary damage. "It is immaterial whether damage is caused." 2 Restatement, Contracts 910, comment c, § 476. Also see *McGowan v. Willamette Etc. Land Co.*, 79 Or 455, 155 P 705; *Larsen et al v. Lootens et al*, 102 Or 579, 194 P 699, 203 P 621; *Brooke v. Perfection Tire Co.*, 110 Or 567, 223 P 939.

■ The plaintiffs bargained for a business which was producing a net income of $16,000 per year, not one producing less than half that amount. *Hefferan v. Freebairn*, 34 Cal2d 715, 721, 214 P2d 386, involving the purchase of a restaurant business, is analogous. There the court said:

"* * * 'It is not essential to the right to rescind a contract for the purchase of property that the purchaser should be able to show that the property purchased was worth less than he paid for it. It is enough that he was induced, by false representations, to buy property which would, if the representations had been true, have been worth more than it actually was worth. Spreckels v. Gorrill, 152 Cal. 383 [92 P. 1011].' It is obvious that receiving a business earning less than $10,000 a year constitutes a substantial injury to a buyer to whom it was represented as earning $20,000. The plaintiff need not plead or prove pecuniary

loss, so long as the record indicates that there was an injury or prejudice resulting from the fraud."

Plaintiffs are entitled to a decree of rescission with interest on the money due them from December 17, 1964, the date of the original decree in the lower court.

Reversed and remanded for the entry of a decree in accordance with this opinion.