Argued April 3, affirmed May 17, 1973

KRAUSE ET AL, *Respondents,* v. EUGENE
DODGE, INC., *Appellant.*

509 P2d 1199

488

*Derrick E. McGavic,* Eugene, argued the cause for appellant. With him on the briefs were Gildea, Speer & McGavic, P.C., Eugene.

490

*Lawrence F. Cooley,* Eugene, argued the cause and filed the brief for respondents.

TONGUE, J.

This is an action for damages for alleged fraud by an automobile dealer in the sale as a "new car" of an automobile which had been driven 5,869 miles. Defendant appeals from a judgment based upon a jury verdict awarding plaintiff $250 in general damages and $6,000 in punitive damages. We affirm.

Defendant's primary contention in this hotly contested case is that its motions for nonsuit and directed verdict should have been granted for lack of "clear and convincing" evidence, as required in an action for fraud. It thus becomes necessary to review the record.

██ Because of direct conflicts in the testimony it must be kept in mind the function of this court in such a case is to determine whether there was sufficient evidence to support the jury verdict and that for this purpose the evidence must be viewed in the light most favorable to the plaintiffs and all conflicts in the evidence must be resolved in favor of the plaintiffs. This is because, after the verdict, the plaintiff is entitled to the benefit of all favorable evidence, as well as all favorable inferences which may be reasonably drawn from such evidence. See *Cronn v. Fisher,* 245 Or 407, 416, 422 P2d 276 (1966). Accordingly, and also because it is ordinarily the exclusive function of the jury to pass upon the credibility of witnesses, we must include for the purposes of this review, reference to all evidence which tends to support the jury verdict in favor of the plaintiffs despite the fact that some testimony

may have been given by witnesses whose credibility was impeached and despite the fact that considerable testimony to the contrary was offered by defendant.

1. *Summary of evidence.*

 a. *Inquiry about mileage on odometer—"reading" of odometer by salesman as "500—some miles."*

In September 1970, plaintiff Clairene Krause and her son, plaintiff Chester Crane, went to defendant's establishment looking for a car for the son, who was then 20 years of age and had just returned from service in the Army. They talked to a salesman named Ken Williams, who showed them a 1970 Dodge Challenger automobile on defendant's new car lot. This car, unlike most domestic automobiles, had a separate "trip" odometer, which showed both miles and tenths of miles. There was also a separate odometer which showed total mileage, but did not show tenths of miles, as shown on the odometers of most domestic cars. That odometer then showed 5,869 miles.

Mrs. Krause and her son took the car for a test drive and upon returning it she and her son asked Mr. Williams "about the mileage." Mrs. Krause testified, "[t]o me, I read it as 500—something and I asked him how a new car had so many miles." She and her son testified that Mr. Williams "looked in" and "read off five-hundred—some miles" and said "[n]ot really; the car had been on the lot several months" and "that wasn't very many miles for as long as the car had been there being test-driven," but that this "was a new car, just driven by people wanting to test it."

Mr. Crane testified that all the odometers that he had seen did not have a separate "trip" odometer,

but had "all the digits on one line, including the tenth" of a mile and that he asked Mr. Williams about the separate "trip" odometer and was told that it was a "foreign speedometer" he didn't know how to "read," but that he would have someone else "explain" the odometer to them. Mr. Crane also testified that in response to their inquiry about the mileage on the car they were never told that "there [were] 5,869 miles on that car."

### b. *Signing of "Buyer's Order" in blank—prior sale of car and repossession.*

Mrs. Krause and Mr. Crane then went "inside" with Mr. Williams to discuss a price. The car had no "sticker" with a price and they were told by Mr. Williams that this was because the 1971 models were then "on the floor." According to plaintiffs, Mr. Williams said that he thought the "sticker" price was "in the four thousand bracket" and "offered it to us for thirty-nine hundred." Mr. Crane thought that was "a little steep" and offered $3,700 for the car and that price was then agreed upon. Plaintiffs were not told that the same car had previously been sold for $3,575 to another purchaser in return for a bad check and the car had been driven to Illinois where it was recovered and driven back to Eugene, where it was "cleaned up" and put on the "new car lot" for sale as a "new car."

Mrs. Krause and Mr. Crane testified that Mr. Williams then brought in "some papers" and discussed the down payment and "financing." She testified that Mr. Williams then gave them a "rough estimate" of the payment "figures" and told her that "if we just signed the papers and take the car home and they would complete the paper work later"; that Mr. Wil-

liams then "indicated" where she was "supposed to sign" by marking "X's" on a "buyer's order"; that she did not read the contract, but placed her signature at each of those "X's"; that the contract was not then "filled in," but was "in blank" and that they then took the car home, after leaving a check for the down payment. Plaintiffs were not given a copy of the "buyer's order" at that time.

Mrs. Krause also testified that her husband (the stepfather of her son) also signed the "buyer's order" that night "after he got off from work" and that "one of the fellows came to the window and put the papers out and he just signed his name and left." That signature appears at the bottom of the "buyer's order" as a "co-buyer," while Mrs. Krause signed as the "buyer." Mr. Krause was also named as a plaintiff, but did not testify.

### c. *Return of car for repairs—discovery of actual mileage on odometer.*

Mr. Crane testified that later he took the car in for minor repairs and inquired again about the odometer because on the "trip" odometer "the whole row would move at once, like 111 would go to 222" and because he had difficulty reading the "last digit" of the separate odometer showing total mileage. He testified that in response to these inquiries "they kept telling me it wasn't working" and that he was finally told by defendant's sales manager that they would order a new speedometer.

Meanwhile, Mrs. Krause drove the car to California and testified that before doing so she wanted written evidence that they owned the car which they did not then have. Mrs. Krause testified that for this

reason Mr. Crane went down and asked for a copy of the "contract" and was then given a copy of the "buyer's order" which was not "really read" at that time, but was only "glanced at" and put in the glove compartment of the car during that trip and later was put in her "file box."

Mrs. Krause testified that she first learned that the car had over 5,000 miles "on it" when purchased, instead of 500—some miles, some three months later when her son took the car in for further repairs and was told that the "12 months or 12,000 miles" warranty on the car had expired.

 d. *"Notation" of mileage on "Buyer's Order"—conflict of testimony.*

The copy of the "vehicle buyer's order," as delivered by defendant to Mr. Crane, included the following notation in handwriting:

> "This unit has been licensed and driven 5869 miles prior to the date of this sale.

"X Clairene Krause"

That signature was one of three by Mrs. Krause on that document, each preceded by an "X".

Mrs. Krause testified, however, that this notation was not on the document when she placed her signature at that "X," as directed by Mr. Williams, and that she was "positive" that the order was in "blank" when she signed it. After lengthy cross-examination, she admitted that in her deposition she stated that she did not remember whether it was blank, but testified that to the best of her knowledge it was blank and that this statement was true. In her deposition she stated elsewhere that the notation about mileage was not on the

document when she signed it. She also said in response to a question on cross-examination, that she was not "accusing" defendant of altering anything, but that she was "confused" by the questions on cross-examination. Subsequently, she testified that "I remember a lot about it, that it was blank." In response to further questions on cross-examination she also testified both that she could not remember and that she believed that document was blank when she signed it. On redirect examination she said that this was still her testimony.

Her son, Mr. Crane, testified that he was present when she placed her signature on that document; that he "looked at those papers"; that he did not see a statement that the car had been driven 5,869 miles and "there wasn't nothing like that at all" on the "buyer's order" at that time. On cross-examination he admitted that he did not actually "read" the "buyer's order" and that it could have been "partially filled out," but that he did not think that it was filled out, at least "completely," but could not be sure if it was "partially filled out." He also said that he watched Mr. Williams "fill out papers" and "fill it out" and that Mr. Williams had been running back and forth to the manager's office and "writing everything down," but that he did not know "if it was this he was filling out" and that Mr. Williams was writing down figures on "scratch paper." He also testified that Mr. Williams "told us to go ahead and take the car that night and he'd have the rest of the paper work for my stepfather to sign. He said, 'it's ours,' so we wrote him out a check then" for the down payment, which Mr. Williams said that he had to have at that time.

Defendant's witnesses also testified that the "buyer's order" was not "filled out" by Mr. Williams. They testified, however, that it was "filled out" by de-

fendant's manager and that this handwritten "notation" was on the "buyer's order" at the time that it was signed by Mrs. Krause and that it was not signed "in blank by her." They also testified that the defendant's "strict" and "inflexible" policy was that all such contracts were completely "filled out" before being signed by a purchaser; that defendant had made similar notations on many other previous "buyer's orders"; that this was its usual practice and policy.

e. *Practice of selling current models with substantial mileage as "new cars."*

Defendant's witnesses also testified that the fact that this car had been previously sold to another purchaser for a bad check and had been driven to Illinois and back had "nothing to do" with whether it was still a "new car," so long as it had not been "licensed"; that cars such as "demonstrators" or "executive" cars would commonly be sold as "new cars," even though they had been driven several thousand miles; that it was customary to sell cars with "lots of miles on them" as "new cars"; that 6,000 miles was not an "unusual number of miles" for such a car; that the decisive factors in determining whether a car was a "new" or a "used" car was not the fact that the car had been driven several thousand miles, but whether it had been "licensed" to another purchaser, and whether the car could still qualify for the factory "new car warranty," and that in such an event a car with several thousand miles "on it" could properly be sold as a "new car," even though that warranty would then only apply for the remainder of the miles covered by the warranty.

Defendant's witnesses also testified that although their usual practice in the sale of a car such as a

demonstrator as a "new car" was to tell a prospective customer that it had "mileage on it," the practice was not to state the number of miles that such a car had "on it" or "how the miles were put on the car" or that a car had been a "demonstrator" unless the customer asked for that information and that there was "no obligation" to tell a customer that a car had miles "put on it" as a demonstrator or that it had "been taken off the lot," or, in this case, that the car had been driven to Illinois and back, "unless the buyer asked."

f. *Admitted failure to inform plaintiffs of previous sale of car—dispute over warranty.*

Defendant's salesman, Mr. Williams, admitted that he did not tell plaintiffs "how many miles were on the car," or that it had been driven to Illinois and back because "they didn't ask," although saying that he told them that the car "had mileage on it." He denied, however, plaintiffs' testimony that he told them that the car was a demonstrator, as well as their testimony of inquiries about the mileage on the car and the "speedometer."

Defendant's used car manager testified, however, that he recalled being asked later to read the "speedometer," apparently for Mr. Crane when he brought it in later for repairs, and that "it was eleven thousand something" at that time. The manufacturer's warranty for the "entire vehicle, except tires," was for 12 months or 12,000 miles to the "first registered owner" and for 5 years or 50,000 miles for the motor and some major parts. Defendant's same witness testified that he told Mrs. Krause, who was concerned over the warranty, that there would be "no problem" with the warranty; that defendant would

make repairs without charge even though not required to do so by the terms of the warranty, and defendant apparently did so until Mr. Crane traded the car in to another dealer.

Mrs. Krause and Mr. Crane testified that defendant first told Mr. Crane that the warranty "was up" after the car had been driven 12,000 miles, but that when they complained they were told that defendant would "take care of everything." Mr. Crane testified that he thought that defendant would have honored the warranty. Mrs. Krause testified, however, that she still considered the warranty to be "no good" and according to the terms of the warranty neither the defendant nor any other dealer was required to honor the basic "12 months—12,000 mile" warranty after the car had been driven 12,000 miles.

Plaintiffs also testified that they would not have bought the car if they had known at that time that it had been previously driven 5,869 miles or that it had been "stolen" and driven back to Illinois because they wanted a new car. Mr. Crane also testified that he "took his [Mr. Williams] word" when told by him that the car had "500—some miles on it."

g. *Testimony of value of car.*

Plaintiffs' testimony relating to the value of the car at the time of its purchase by plaintiffs consisted of the testimony of Mr. Crane as owner of the car, that in his opinion it had a fair market value of "around $3,200" instead of $3,700, as paid by him, in its condition at that time, including over 5,000 in mileage. Plaintiff's complaint prayed for damages in the amount of $500, the difference between those two amounts. On cross-examination, Mr. Crane stated

that he had made an investigation of the value of the car by inquiry of several car dealers either "what the price of the car would be" or what they would have paid him at that time for that car. He also testified that these dealers checked the "blue book" value of the car for him.

Defendant's witnesses testified that the "sticker price" on this car was "around $4,200" and that the price of $3,700 at which the car was sold to plaintiffs, "reflected" the amount of mileage then on that car. Defendant's witnesses admitted, however, that this car had been previously sold for $3,575 to a previous purchaser; that the price of such a "new car" with 5,000 miles on it would be less than on one with 500 miles; that the more a car is driven the more it depreciates and that "if you buy a car with more miles something is likely to go wrong with it." Defendant's witnesses also admitted that they would have been willing to sell this car to plaintiffs for less than $3,700 "if he would have offered less," but testified that the selling price of such an automobile is arrived at by "whatever [the purchaser] will pay and whatever figure we end up with"; and that if this car were sold for less than the "suggested retail price" of $4,200 that was "because we couldn't get the customer to pay any more."

2. *There was sufficient evidence to support a finding by the jury of "clear and convincing" evidence of fraud.*

■ The fraudulent representations alleged by plaintiffs and submitted to the jury were that the car was a "new automobile"; that it had been driven approximately 500 miles; that it had only been driven for short periods of time for demonstration purposes only;

that it had received excellent care in that it had never been taken overnight by an individual, and that it was entitled to a new car warranty.

### a. *The representation that this car had been driven only "500—some miles."*

Defendant's primary contention relates to the alleged representation that the car had been driven only approximately 500 miles and the question of justifiable reliance on that alleged representation. Thus, defendant's say that the "speedometer" of the car showed that it had been driven over 5,000 miles and the "buyer's order" contained a notation, signed by Mrs. Krause, that the car had been driven 5,869 miles.

The outcome of this case, as in many cases, depended upon which witnesses the jury chose to believe and to disbelieve. If the jury had believed defendant's witnesses, and disbelieved the plaintiffs', there would have been substantial testimony to support a finding by the jury that the notation relating to mileage was on the "buyer's order" when it was signed by Mrs. Krause and that she and her son were not telling the truth in their testimony to the contrary. The jury, however, apparently believed the testimony of the plaintiffs and disbelieved that of the defendant's witnesses. Both Mrs. Krause and Mr. Crane testified that the "buyer's order" was not "filled out" when it was signed by her; that she signed it "in blank" at the three "X's" marked by Mr. Williams and that the notation relating to mileage was not on the "buyer's order" when it was signed by her. Mr. Crane not only corroborated that testimony, but also testified that the odometer on the car, with its lack of the usual column

showing tenths of a mile, was confusing to him and was "read" to him by Mr. Williams as showing 500— some miles, instead of 5,000 some miles. In the face of this testimony we cannot say that there was not sufficient evidence to support a finding by the jury that the defendant represented that this car had been driven only approximately 500 miles and that plaintiffs were justified in relying on that representation.

Defendant strongly contends that under the facts of this case plaintiffs had no right to rely upon any such misrepresentation. In *Furtado v. Gemmell,* 242 Or 177, 182, 408 P2d 733 (1965), we said:

"[i]t may be stated as a broad generalization that there is a duty on the part of a representee to use some measure of protection and precaution to safeguard his interest. 23 Am Jur, Fraud and Deceit 960, § 155.

"'* * * Courts have differed somewhat in their application of this principle, but this court has approved the view that it is better to encourage negligence in the foolish than fraud in the deceitful.' *Hansen v. Holmberg,* 176 Or 173, 184, 156 P2d 571."

Defendant also contends that the testimony of Mrs. Krause on cross-examination not only conflicted with her direct testimony, but so "explain[ed] [her] prior testimony as to leave the facts to which [s]he testifie[d] a mere matter of conjecture, possibility or guess," citing *Washburn v. Simmons,* 213 Or 418, 421, 323 P2d 946, 325 P2d 255 (1958).

In that case plaintiff's only medical expert witness testified on direct examination, in answer to a hypothetical question, that the accident aggravated a pre-existing condition. On cross-examination, however, he conceded, without qualification, that it was

impossible for him to say what was the cause of plaintiff's condition and that her condition was common to women who had never been involved in an accident.

In this case, however, while there was inconsistencies between the direct testimony of Mrs. Krause and her testimony on cross-examination, she never conceded as a fact that the notation relating to mileage was on the "buyer's order" when it was signed by her, and while she said in response to some questions that she could not remember, she also stated that it was her belief that the notation was not on the document when it was signed by her and repeated that statement on redirect examination. Moreover, her testimony was not the sole testimony on that subject, but was corroborated by the testimony of her son, not only by his testimony on this particular subject, but by his testimony that he was confused by the "speedometer" and that Mr. Williams "read" it to him as showing 500 some miles.

In addition, in deciding whether to believe plaintiffs' testimony and to disbelieve the testimony of defendant's witnesses on this subject, as it did, the jury may also have given some weight to admissions by defendant's witnesses that their customary practice was not to mention to customers the specific number of miles of prior operation or other specific details of the prior operation of a "new" car with prior "miles" on it unless asked by the customer for such information.

■ We are fully aware of the rule that fraud must be proved by evidence which is "clear and convincing," the test of which is that the evidence must be such that the truth of the facts asserted is "highly probable." *Cook v. Michael*, 214 Or 513, 527, 330 P2d 1026 (1958).

■ The question of the credibility of witnesses, however, is ordinarily one to be decided by the jury and if, despite inconsistencies in the testimony of a witness, the jury chooses to believe that witness, such testimony has been held to be sufficient to support a jury verdict even in criminal cases, in which the burden of the state is to prove guilt beyond a reasonable doubt. See *State v. Yates,* 239 Or 596, 598, 398 P2d 161 (1965), and *State v. Pace,* 187 Or 498, 504, 212 P2d 755 (1949). See also *Thom v. Bailey,* 257 Or 572, 579, 481 P2d 355 (1971).

■ Defendant also relies upon the rule that when a party testifies to a fact, his adversary is entitled to hold him to it as a judicial admission, citing *Morey, Administratrix v. Redifer et al,* 204 Or 194, 214, 264 P2d 418, 282 P2d 1062 (1955), and *Bockman v. Mitchell Bros. Truck Lines,* 213 Or 88, 98-99, 320 P2d 266 (1958). That rule applies, however, only to where a party testifies deliberately to a "concrete fact" and not as a matter of "uncertain memory," among other qualifications. These requirements were not satisfied by any "admissions" by plaintiffs relating to the notation on the "buyer's order."

■ Defendant also contends that when to establish fraud a plaintiff relies on negative evidence, such evidence will not sustain a verdict in the face of uncontradicted positive evidence from an unimpeached witness, citing 66 ALR 1532, 1537-38 (1930). Any such rule is also not satisfied in this case because while the testimony of defendant's witnesses on this point may have been "positive," it did not come from witnesses whose credibility was "unimpeached" and there was other evidence in addition to plaintiffs' testimony from which the jury could have drawn inferences corrob-

orating the truth of plaintiffs' testimony and the untruth of defendant's testimony.

b. *The representation that this car was a "new automobile."*

Defendants also deny that the representation that the 1970 Dodge Challenger automobile was a "new automobile" was not true and, if untrue, that it was made with the necessary knowledge of its falsity and with an intent to defraud plaintiffs.

■ It may be that among automobile dealers a current model car which had been previously sold to another purchaser in return for a bad check and driven to Illinois and back, a distance of over 5,000 miles, would still be considered as a "new car," rather than a "used car," within the "trade meaning" of that term, as used by automobile dealers. (Cf. 9 Wigmore on Evidence (3d ed 1940) 186, 208-09, §§ 2460, 2464.) It does not follow, however, that members of the public who purchase automobiles are bound by the "trade meaning" among automobile dealers of the words "new car." Indeed, a member of the public who purchases a car which is represented to him as a "new car" is entitled to understand the words "new car" by giving those words their ordinary meaning, at least in the absence of evidence that he understood and intended that term to have some other meaning. The question of whether in such a case the words "new car" were understood and intended by the purchaser to be given their "trade meaning," among automobile dealers rather than the ordinary meaning of those words, was a jury question. Cf. *May v. Chicago Insurance Co.,* 260 Or 285, 293-94, 490 P2d 150 (1971).

■ There was ample evidence in this case from

which the jury could find, as it apparently did find, that plaintiffs did not understand that defendants, in selling this car as a "new car," used those words in accordance with the "trade meaning" of those words among automobile dealers, but that plaintiffs understood those words in their ordinary sense; that this car was not a "new car" in the ordinary meaning of those words, and that defendant either knew or should have known that a car which had been previously sold in exchange for a bad check, driven to Illinois, recovered there and driven back to Oregon, for a total of over 5,000 miles, was not a "new car" within the ordinary meaning of those words and within the meaning of those words as understood by plaintiffs.

■ The jury could also have found from the evidence in this case that for defendant to represent this car to be a "new car" was, at the best, a "half-truth." In such cases this court has recognized that because "a half-truth is sometimes the worst kind of a lie" (*Bond v. Graf,* 163 Or 264, 272, 96 P2d 1091 (1939)), one who makes a representation to the purchaser of a product in the nature of a "half-truth" thereupon assumes the affirmative obligation to make a "full and fair disclosure" of the "whole truth" (*Dahl et al v. Crain et ux,* 193 Or 207, 224, 237 P2d 939 (1951)), even though he would have had no such obligation had he not undertaken to state such a "half-truth." (See *Heise et ux v. Pilot Rock Lbr. Co.,* 222 Or 78, 86, 352 P2d 1072 (1960).) This rule has particular application to automobile dealers who undertake to sell as "new cars" current model "demonstrators, executive cars" or other current model automobiles which have been previously driven for substantial mileage.

Upon examining the record we find that there

was also substantial evidence from which the jury could properly find that defendant made the other representations alleged by plaintiffs and which, taken as a whole, all relate to the basic representation by defendant that the car which it sold to plaintiffs was a "new car."[1] In addition, there was substantial evidence to support a jury finding of reliance in that Mrs. Krause and Mr. Crane testified that they wanted a new car and would not have purchased this car had they known that it had been previously sold in exchange for a "bad check" and driven to Illinois and back, for a total of over 5,000 miles. We also find that there was sufficient testimony from which the jury could find, if it believed plaintiffs' testimony, as it was entitled to do, that such reliance by plaintiffs upon the representation made by defendant was justified, despite defendant's contention to the contrary.

3. *The trial court did not err in excluding defendant's offer in evidence of copies of other "buyer's orders" with similar "notations."*

■ Defendant also assigns as error the exclusion from evidence of an exhibit consisting of some 50 other and previous "buyer's orders," going back to 1967 and containing similar "notations" of mileage of the cars involved in those transactions.

---

[1] Defendant says that some of the other alleged representations were not "material," but we believe that they were all material to the basic representation that this car was a new car.

Defendant also says that there was no evidence that this car did not have a "new car warranty." While it may be true that defendant would have honored the warranty, the terms of the warranty were such as not to require any other dealer or the manufacturer to honor it, at least for more than the remaining number of miles on the warranty, rather than for all or substantially all of the original warranty mileage.

Defendant contends that this evidence was relevant on four issues: (1) the substantive question whether the "buyer's order" in this case was blank when signed; (2) the credibility of the plaintiffs; (3) the defendant's good faith intention; and (4) to negate defendant's alleged intent to defraud.

In support of these contentions defendant urges that evidence of habit and custom is admissible to prove that behavior on a particular occasion conforms to the habit and custom, citing Model Code of Evidence, Rule 307; Proposed Federal Rules of Evidence 406; and McCormick on Evidence (2d ed 1972) 463-64, § 195; *Fenton v. Aleshire,* 238 Or 24, 393 P2d 217 (1964); *McMillan v. Montgomery,* 121 Or 28, 253 P 879 (1927); and *Start v. Shell Oil Co. and Arntson,* 202 Or 99, 260 P2d 468, 273 P2d 225 (1954). See also *Karsun v. Kelley,* 258 Or 155, 482 P2d 533 (1971).

It appears from the record in this case that defendant was permitted to offer the testimony of several witnesses to the effect that its "inflexible" rule, habit and custom was always to require that all "buyer's orders" be completely filled out before being signed by the buyers.

This exhibit, however, while corroborating such a habit, custom and practice, went even further in that it consisted of specific instances in which similar "notations" had been made on other previous "buyer's orders." While defendant may be correct in asserting that this exhibit had some probative value on these issues, it was not only cumulative, but also raised the question whether any such probative value was outweighed by other considerations. Thus, as stated by McCormick on Evidence (2d ed 1972) 470, § 198, in

speaking of evidence of other transactions with other parties:

> "* * * [s]eemingly, the courts should admit the evidence of other contracts in all cases where the testimony as to the terms of the present bargain is conflicting, and *where the judge in his discretion finds that the probative value of the other transactions outweighs the risk of waste of time and confusion of issues.*" (Emphasis added)

As also stated by McCormick, *supra* at 438-40, § 185:

> "* * * [b]ut relevance is not always enough. There may remain the question, is its value worth what it costs? There are several counterbalancing factors which may move the court to exclude relevant evidence if they outweigh its probative value. In order of their importance, they are these. First, the danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sympathy. Second, the probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues. Third, the likelihood that the evidence offered and the counter proof will consume an undue amount of time. Fourth, the danger of unfair surprise to the opponent, when having no reasonable ground to anticipate this development of the proof, he would be unprepared to meet it. Often, of course, several of these dangers such as distraction and time consumption, or prejudice and surprise, emerge from a particular offer of evidence. This balancing of intangibles—probative values against probative dangers—is so much a matter where wise judges in particular situations may differ that *a leeway of discretion is generally recognized.* * * *" (Emphasis added)

To the same effect, see *Kelty v. Fisher et al*, 101 Or 110, 118, 199 P 188 (1921).

In this case the primary issue was not whether it was defendant's custom and practice to make such "notations" on "buyer's orders," but whether on this occasion the "buyer's order" was signed in blank before such a notation was placed on it. The offer of the prior "buyer's orders" showed only that on those occasions such notations had been added *at some time*. In the absence of the testimony of the buyers involved in those transactions, as well as that of the persons who prepared those buyer's orders, it could not be determined *when* such notations were placed on such documents.

For plaintiffs' attorney to have exercised his right to cross-examine and offer contrary evidence it would have been necessary for him to find and interview or subpoena the buyers for each of these 50 transactions.

It is thus obvious that the offer of this exhibit directly raised the consideration of consuming "undue time," if not also the danger of unfair surprise to plaintiffs and distraction of the jury from the main issues of the case that are referred to by McCormick as the basis for the rule that in such cases the admission or exclusion of such evidence is a matter within the sound discretion of the trial court. This is particularly true where, as in this case, defendant had already been permitted to offer the testimony of several witnesses to the effect that the making of such notations was defendant's "inflexible" habit, custom and practice. We cannot say that the trial judge abused his discretion in sustaining plaintiffs' objection to this exhibit.

*4. There was sufficient evidence to support an award of $250 in actual damages, as well as an award of punitive damages.*

■ Defendant assigns as error the refusal of the trial court to exercise what he claims to be a *right* to question plaintiff Crane as to his qualifications before permitting him to express an opinion as to the value of the car as its owner, citing *Lewis v. Worldwide Imports, Inc.,* 238 Or 580, 395 P2d 922 (1964), and McCormick on Evidence (2d ed 1972) 149-50, § 70.

We know of no such right and do not read *Lewis* and McCormick as announcing such a rule.

■ If no sufficient foundation is laid for opinion testimony an objection may be made on that ground. A trial court also may, "in aid of an objection," permit questions to be asked by opposing counsel relating to the qualifications of a witness or the foundation for his testimony. A trial court is not required to do so, however, but may insist that all such questions be postponed until cross-examination. If it then appears that there is no proper basis for the testimony given on direct examination a motion may be made to strike such testimony.

No such motion was apparently made by defendant in this case and if any such motion was made no error is assigned from the denial of any such motion. Defendant did, however, move for a nonsuit on the ground that plaintiffs' evidence of damages was insufficient.

Thus, defendant contends that there was no competent evidence to support a finding by the jury that plaintiffs suffered damages in the amount of $250; that the proper measure of damages was the differ-

ence between the fair market value of the car at the time of the sale and the fair market value of the car "as represented," and that the evidence offered by plaintiffs was insufficient because it was limited to plaintiff Crane's opinion of the value of the car three or four months after the sale, which was "too remote," and because his opinion was based upon what dealers would have paid him for the car, i.e., its wholesale value, rather than its retail value.

■ The measure of damages sought by plaintiffs was the difference between the actual value of the car at the time of purchase and the amount paid by plaintiffs as its purchase price, i.e., the "out-of-pocket loss," or "actual loss," rather than the "benefit of the bargain" measure of damages, as stated by defendant. This was a proper measure of damages in such a case. See *Otte v. Ron Tonkin Chevrolet Co.,* 264 Or 265, 503 P2d 716 (1972).

■ Where the value of personal property is in issue, the evidence is usually confined to its value at the time and place in issue, "or at a reasonable time before and after that particular time." *Stillwell v. Hill,* 87 Or 112, 123, 169 P 1174 (1918). Evidence of value of property three or four months before or after the date of a sale is not necessarily "too remote" to be admissible and such a question of "remoteness" is ordinarily one to be decided by the trial judge, by the exercise of his sound discretion. *Mattechek v. Pugh,* 153 Or 1, 12, 55 P2d 730 (1936). See also *Grover v. Sturgeon,* 255 Or 578, 587, 469 P2d 617 (1970).

■ A more serious problem arises from the fact that it appeared on cross-examination that plaintiff Crane's opinion of the value of the car was based in part upon what some dealers told him that they would pay

him, or would have paid him for the car. He also testified, however, that he asked other dealers "what the price of the car would be" and that the dealers looked up the "blue book" value of the car for him, which would have shown both its retail and wholesale value. Furthermore, his initial testimony on direct examination was to express the opinion as owner of the car that on the date when he purchased the car its fair market value was "around $3,200," or $500 less than the $3,700 paid by him for it. In our opinion this testimony had some evidentiary value on the issue of the market value of the car at the time of its sale to plaintiffs, the weight and effect to be given to such testimony being a question for the jury. See *Hansen-Rynning v. Oregon-Wash. Etc. Co.*, 105 Or 67, 70, 209 P 462 (1922). See also *Lewis v. Worldwide Imports, Inc., supra* at 586.

█ In addition to plaintiffs' testimony, defendant's witnesses testified that the price of such a "new car" with 5,000 miles on it would be less than the price of a "new car" with 500 miles on it. This, of course, is also a matter of common knowledge. After reviewing all of the evidence, we conclude that even if plaintiff Crane's opinion that the fair market value of the car as purchased by him was $3,200 (or $500 less than the sales price) be considered as insufficient, there was sufficient evidence from which the jury could properly find that plaintiffs suffered some damage, upon consideration of all of the testimony, in light of facts which are matters of common knowledge and experience and which a jury may always consider.[2] On that basis, we cannot say that there was no substantial evidence to support the finding by the jury that the

---

[2] McCormick on Evidence 691, § 324 (1954).

actual value of the car in its condition at the time of its purchase by plaintiffs (after its previous sale in exchange for a "bad check" and after being driven to Illinois and back for a total of over 5,000 miles), was at least $250 less than the price of $3,700 paid by plaintiffs for this car (which was based upon their assumption that it was a "new car" with only "500—some miles" on it, as represented by defendant).

Finally, defendant assigns as error the award of $6,000 in punitive damages, contending that "[v]iewed in the light most favorable to the plaintiffs, there is no evidence whatsoever that the defendant was actuated by malice, ill will, bad intent or the like" and that "[t]here simply were no aggravating circumstances involved in the transaction * * *," citing *O'Harra v. Pundt,* 210 Or 533, 310 P2d 1110 (1957).

On the contrary, when the entire record in this case is "viewed in the light most favorable to the plaintiffs," as defendant must concede, we conclude that there was testimony from which, if believed by the jury, it could have found that defendant misrepresented this car to plaintiffs as a "new car," with only "500—some miles" on it and then sought to "cover its tracks" by having the "buyer's order" signed "in blank" by Mrs. Krause, by not giving plaintiffs a copy of the "buyer's order" at that time, and by adding later the notation that the car had actually been driven over 5,000 miles. Cf. *Lewis v. Worldwide Imports, Inc., supra* at 581-82. The record in *O'Harra v. Pundt* did not contain comparable testimony. We hold that if the jury believed the testimony offered by plaintiffs, as it apparently did, it could properly make an award of punitive damages in this case.

Finding no error, we affirm the judgment of the trial court.