BLANK, *Respondent,*
*v.*
FAR WEST FEDERAL SAVINGS et al,
*Appellants.*
(No 419-113, SC 24811)

575 P2d 148

William E. Hurley, Portland, argued the cause for respondent. With him on the brief were Bernard Hurley, Hodges & Kneeland, Portland.

Before Denecke, Chief Justice, Bryson and Lent, Justices, and Gillette, Justice Pro Tempore.

BRYSON, J.

**BRYSON, J.**

Plaintiff brought this action in fraud and deceit against defendant[1] (hereinafter Far West) to recover a commission for the sale of property he would have received but for the defendant fraudulently inducing him to cancel his exclusive listing agreement covering the property. Defendant appeals from a judgment entered on a jury's verdict in favor of plaintiff for general and punitive damages.

Plaintiff's complaint alleged that on March 28, 1975, defendant gave him a written, exclusive one-year listing agreement to sell "Heritage Village," a mobile home park and property (Phase I) in Washington County at a commission of 3½ percent of the selling price; that defendant, through its subsidiary corporations and officers, falsely represented to plaintiff that the property had not been sold when in fact it had been sold and in reliance thereon plaintiff signed a document canceling his exclusive listing agreement to sell for the sum of $10,000; that "[a]t that time, defendants intentionally conspired to keep from plaintiff the fact that an agreement had been reached for the sale of Heritage Village to Bocek, and specifically to a corporation, Heritage City, Inc., incorporated by Bocek on May 23, 1975" for the sum of $1,640,000; that the sale would have entitled plaintiff to a commission and he was thereby damaged.

Defendant's answer admitted certain of plaintiff's allegations, generally denied the remaining allegations, and affirmatively alleged that plaintiff and defendant executed the agreement canceling plaintiff's exclusive listing and employment agreement and that defendant paid plaintiff the sum of $10,000; that plaintiff is barred from any recovery herein.

---

[1]Defendant Dean Vincent was granted an involuntary nonsuit and is not a party to this appeal. Defendants Greentree Development Corp. (Greentree) and Ponderosa Enterprises, Inc. (Ponderosa), are subsidiary corporations of Far West. All defendants herein are referred to as Far West unless otherwise recited.

Defendant first contends that the trial court erred in failing to grant defendant's motion for a judgment of involuntary nonsuit and its motion for a directed verdict based upon plaintiff's failure to prove fraud.

Because defendant's appeal is primarily based on the interpretation of the evidence, which plaintiff strongly disputes, we first consider how we are to judge the evidence on review. In *Green v. Uncle Don's Mobile City,* 279 Or 425, 427, 568 P2d 1375 (1977), we stated:

> "On such an issue, we determine if there is sufficient evidence to support the jury's verdict. The plaintiff is entitled to the benefit of all favorable evidence and all favorable inferences which may reasonably be drawn from the evidence. Further, the jury judges the credibility of the witnesses testifying before it. Accordingly, we view the evidence in the light most favorable to the plaintiff, and all conflicts of evidence must be resolved in favor of the plaintiff. *Lipinsky v. Hufft,* 271 Or 572, 573, 533 P2d 328 (1975); *Krause v. Eugene Dodge, Inc.,* 265 Or 486, 490, 509 P2d 1199 (1973)."

In *Krause v. Eugene Dodge, Inc.,* 265 Or 486, 502, 509 P2d 1199 (1973), we acknowledged the rule that fraud must be proved by clear and convincing evidence and that this evidence must be such that the truth of the facts asserted is "highly probable." We further stated, at 503:

> "The question of the credibility of witnesses, however, is ordinarily one to be decided by the jury and if, despite inconsistencies in the testimony of a witness, the jury chooses to believe that witness, such testimony has been held to be sufficient to support a jury verdict even in criminal cases, in which the burden of the state is to prove guilt beyond a reasonable doubt. [Citations omitted.]"

Defendant makes several arguments under this first contention of error. To understand the issues, it is necessary to set forth certain facts chronologically:

■ In 1971 Far West organized subsidiary corporations, one of which was "Greentree," known as Phase I,

Heritage Village Mobile Home Development, and Phase II, consisting of 42 acres of bare land. The other was "Ponderosa," to sell and place model mobile homes upon the Heritage Village project. The subsidiary corporations were not a financial success and federal supervising authorities were pressuring Far West to dispose of these assets before it affected the parent company.

■ On November 20, 1974, Far West entered into a written employment contract with plaintiff Blank to, among other duties, "[a]ssist in the management and marketing activities of the subsidiary organizations in whatever capacity assigned."

■ The licensed real estate broker, Mr. Moffatt, employed by defendant to sell defendant's mobile units, left defendant, and on March 28, 1975, defendant entered into a series of exclusive REAL ESTATE BROKER'S EMPLOYMENT CONTRACTS with plaintiff, including Heritage Village Homes, Phase I, which provided:

> "THIS LISTING IS AN EXCLUSIVE LISTING and you hereby are granted the absolute, sole and exclusive right to sell or exchange the said described property. In the event of any sale, by me or any other person, or of exchange or conveyance of said property, or any part thereof, during the term of your exclusive employment, or in case I withdraw the authority hereby given prior to said expiration date, I agree to pay you the said commission just the same as if a sale had actually been consummated by you."

Plaintiff organized and licensed the "Golden Eagle" real estate company for this purpose. A written agreement between the parties dated February 26, 1975, stated that plaintiff's compensation per the employment contract of November 20, 1974, and that as real estate broker were "separate and apart."

■ On May 7, 1975, plaintiff's employment with defendant was terminated.

[ 401 ]

■ On May 6, 1975, Dean Vincent, Inc., found buyers for the Heritage Village development, Robert and Donald Bocek, for $1,640,000, subject to financing by Far West.

■ On May 25, 1975, the earnest money agreement was signed by the Boceks and defendant, and Safeco Title Insurance Company issued preliminary title reports.

■ On May 25, 1975, the executive committee of Far West approved a loan in the amount of $2,028,500 to the Boceks for financing. The Boceks had previously formed Heritage City, Inc., to operate Heritage Village.

■ On May 30, 1975, plaintiff and defendant signed an agreement canceling the March 28, 1975, exclusive listing and real estate broker's employment contracts held by plaintiff.

■ On May 30, 1975, the deed to Heritage City, Inc., was executed.

Defendant first argues that defendant committed no tort against plaintiff because it acted to protect a legitimate employer's interest and owed no obligation to pay any sums of money to plaintiff. Under this general argument, defendant contends that "Far West rightfully terminated Mr. Blank's contract"; that in 1975 Far West established Golden Eagle Properties and owned the Golden Eagle office.

As previously stated, the evidence shows there was an employment contract on November 20, 1974, between the parties, and the exclusive real estate broker's employment contract was not executed until March 28, 1975. It is true the November 20, 1974, employment contract was terminated, but plaintiff's action is not based on that contract but, rather, on fraud and deceit claimed to have been perpetrated by defendant in the attempt to cancel the March 28, 1975, exclusive listing contract.

[ 402 ]

Defendant was not licensed to and could not operate as a real estate broker in Oregon. Far West could not own and operate "Golden Eagle" as a real estate brokerage office to sell real property. That is why it was necessary for them to grant a listing to a licensed real estate broker such as plaintiff Blank. The evidence shows that plaintiff organized and licensed Golden Eagle for this purpose. Mr. Percell, a real estate salesman who operated under plaintiff Blank, a real estate broker, in the sale of defendant's property, testified as follows:

"A. Yes. Mr. Blank indicated that he was going to form a separate company—Golden Eagle Properties. We selected this name between the two of us. It's my understanding that this was to be entirely separate and distinct from his duties as Manager-Director of Heritage Village. We did in fact choose the name.

"Mr. Blank made a specific trip to Salem to obtain the broker's license and in fact obtain my license at the same time as an independent contractor under his directorship or brokership with Golden Eagle Properties."

There is an abundance of evidence from which the jury could find that there were two separate contracts—the first employment contract of November 20, 1974, and the subsequent exclusive real estate broker's employment contract of March 28, 1975. There is testimony that Mr. Jaques, president of Far West, knew that plaintiff had a valid exclusive real estate broker's contract on the property of Heritage Village and that he sought ways and means of getting around the contract. This included the employment of outside counsel for advice on the matter after he was advised that there was a sale of the entire property, Phase I and Phase II, to the Boceks. Defendant further argues that "when Far West terminated Mr. Blank, he lost all claims to the listing agreement." There is evidence from which the jury could find to the contrary.

It should also be pointed out that defendant's answer admits "that plaintiff * * * [was a] real estate broker licensed by the state of Oregon, and that

plaintiff has done business under the name Golden Eagle Properties." The main thrust of the defendant's case before the jury was that it had received a valid release and cancellation of plaintiff's real estate broker's employment contract and exclusive listing. The jury found to the contrary.

Under its first assignment of error, defendant next argues that "plaintiff failed to prove fraud as a matter of law." In *Musgrave et ux v. Lucas et ux,* 193 Or 401, 410, 238 P2d 780 (1951), we set forth the essential elements in an action for fraud:

> "Comprehensively stated, the elements of actionable fraud consist of: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; * * *."

*See also Rice v. McAlister,* 268 Or 125, 128, 519 P2d 1263 (1974).

If defendant can show that plaintiff did not prove fraud, then plaintiff would be bound by the agreement whereby he agreed to cancel the listing agreement in consideration of $10,000.

However, plaintiff produced an abundance of evidence from which the jury could have found that the defendant acted fraudulently and deceived plaintiff. The evidence discloses that in early May, 1975, the defendant knew it had a prospective buyer for the entire Heritage Village development, which it was under pressure to sell. The operation was a financial failure. Defendant was aware of the exclusive listing for the sale of the property it had granted to plaintiff. On May 9, 1975, Mr. Jaques and Mr. Schmit, president and house counsel of defendant, consulted independent counsel for an opinion as to the validity of the plaintiff's exclusive listings and to calculate their chances in litigation and possible defense costs. Mr. Jaques testified, on cross-examination, as follows:

[ 404 ]

"Q. * * * Before this settlement agreement was reached, isn't it true that Mr. Blank inquired of the status of Heritage Village?

"A. Of myself?

"Q. Yes.

"A. On the 30th, he inquired as to the status of Heritage Village, that is correct.

"Q. Okay. He wanted to know whether the property had been sold, didn't he?

"A. That was the essence of it, yes.

"Q. And the essence of your answer was that, well, we are working hard in trying to sell Heritage Village?

"A. That is correct.

"Q. You had been working hard trying to sell Heritage Village for over a year?

"A. That is likewise correct.

"Q. You didn't tell him anything about the fact that you had gotten an earnest money from the Boceks and that it had been accepted and that there had been loan applications and that the Executive Committee had approved and that the loan or the transaction was slated to be completed that very day? You didn't tell him any of that?

"A. I did not."

On May 7, 1975, plaintiff's employment under the November 20, 1974, agreement was terminated. However, he still had his exclusive real estate broker's employment contract. The defendant was aware of this, and the evidence is replete with its effort to deceive the plaintiff of the fact that it had a sale to the Boceks. Defendant's officers and employees, Jaques, Nelson, and Schmit either withheld the truth or made half-truthful statements to plaintiff while defendant was negotiating with plaintiff to secure the cancellation of the exclusive listing for the sum of $10,000. Plaintiff testified:

"Q. Would you have signed the agreement had you known that the property had in fact been sold?

"A. No."

The plaintiff finally signed the agreement canceling the exclusive listings at approximately 6 p.m. on May

30, 1975, the same date that the sale of the property to the Boceks was scheduled to be closed.

Defendant also argues that plaintiff did not prove his ignorance of the truth, his reliance on the statement, or any right to rely. We have previously concluded that plaintiff did in fact rely on the false or deceiving statements made to plaintiff by defendant and its officers.

Plaintiff's reliance must be reasonable. Defendant argues, in effect, that plaintiff knew that the representations made to him were false and that he was not entitled to rely on them, citing *Ziegler v. Stinson,* 111 Or 243, 224 P 641 (1924), and that he must make his own investigation. However, there is evidence in this case from which the jury could conclude that plaintiff did not *know* that defendant had sold the property to the Boceks and therefore the statements of defendant and its officers were in fact fraudulent. The testimony further shows that on Friday, May 30, 1975, when defendant was trying to obtain a cancellation of Blank's exclusive listing agreement, Mr. Percell, plaintiff's real estate salesman, received a telephone call from another interested purchaser that indicated the Heritage Village property had been sold. Percell testified that he then called Mr. Nelson, defendant's vice president, who was generally in charge of all of the transactions. Percell testified:

"A.  * * * I asked him [Nelson], 'Has the place been sold?'

"Mr. Nelson said, 'No, we have an offer that we are considering, but it has not been sold.'"

Percell then received a telephone call from the plaintiff about 5:30 p.m. on Friday, May 30, and Percell testified that he related to the plaintiff the information he had received earlier and his conversation with Mr. Nelson. Blank testified that just prior to executing the agreement canceling his exclusive listing he talked to Mr. Nelson and Mr. Schmit, officers of defendant, and they each failed to tell him that there

[ 406 ]

had been a sale of the property. There is also evidence that on the afternoon of the day the cancellation agreement was being negotiated and eventually signed by plaintiff, May 30, 1975, Mr. Burke, real estate agent for Dean Vincent, Inc., was also in the head office of Far West. Mr. Burke testified that he was asked not to wait near Mr. Schmit's office but to go to the board room, and Burke assumed there was someone around he was not to see. Burke further testified that Schmit told him that on May 30, 1975, he had hidden Mr. Burke because the plaintiff had been there. It would appear from the evidence that after the plaintiff received the tip from his salesman, Percell, that the Heritage Village Property might have have been sold, he made every effort reasonably possible to determine if in fact there was a sale. From the aforesaid testimony, it is clear that the jury could have concluded that the defendant concealed the truth from the plaintiff and plaintiff did everything reasonably possible to learn of the truth and, having failed to do so, he relied on the false statements or half-truths told to him by the defendant and its officers. In *Furtado v. Gemmell,* 242 Or 177, 182, 408 P2d 733 (1965), we held, "[i]t may be stated as a broad generalization that there is a duty on the part of a representee to use some measure of protection and precaution to safeguard his interest," but we also held that " ' * * * it is better to encourage negligence in the foolish than fraud in the deceitful'," citing *Hansen v. Holmberg,* 176 Or 173, 184, 156 P2d 571 (1945).

We conclude that plaintiff offered evidence showing that he had established all of the required elements of fraud, including plaintiff's ignorance of the truth and his reliance on the statements of the defendant. He was damaged because of the defendant's fraudulent statements when it concealed from him the true facts which caused him to sign the contract canceling his exclusive listing agreement for the sale of the property. *See Green v. Uncle Don's Mobile City,* 279 Or 425, 568 P2d 1375 (1977).

[ 407 ]

Defendant also argues that "[p]laintiff failed to prove a right to recover damages." We have previously discussed some of the same elements contained in previous arguments but defendant further contends that plaintiff's listing agreement covered only Phase I of the property owned by defendant and not Phase II. Clearly, if plaintiff had offered no evidence with respect to that part of the purchase price represented by Phase II, which was included in the sale, there would be a question as to the amount of damages allotted by the jury. However, plaintiff testified:

"A.   Mr. Nelson advised the two of us that the price had been reduced on Heritage Village to the amount of debt that was owed against it plus the unpaid back taxes of three years plus the cost of closing the transaction. It totaled $1,540,000.96. A buyer—any buyer would receive Phase 2 without any value placed on it."

There is other testimony that this was a "fire sale" and defendant was attempting to rid itself of the entire unsuccessful operation. Defendant did not refute the plaintiff's testimony. Under these circumstances the jury was entitled to believe plaintiff's testimony as to the sale price.

Defendant next argues that the trial court erred in submitting the conspiracy issue to the jury. It is plain from the pleadings that this is not an action based on conspiracy, but one in fraud and deceit. The allegation that the defendants conspired is only part of the theory of the defendant's fraud and deceit. The plaintiff rightfully argues that the conspiracy issue was not given to prove a separate tort but merely to show the joint liability of tort feasors, citing W. Prosser on Torts 291-93 (4th ed 1971). There is evidence that all three of the defendant corporations and their officers participated in all or different acts of the fraud perpetrated on the plaintiff. We find no error in this respect.

The defendant next assigns as error the trial court's submitting the issue of punitive damages to the jury. Generally, this court would not allow punitive damages between two parties dealing in the commercial

field over the interpretation or enforcement of a contractual relationship. However, this is not that kind of a case and it was not so pleaded. It is an action in fraud and deceit.

This court has generally relied upon our statement in *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 425, 435 P2d 306 (1967), wherein we stated:

> "* * * It is only in those instances where the violation of societal interests is sufficiently great and of a kind that sanctions would tend to prevent, that the use of punitive damages is proper. * * *"

*See also Nees v. Hocks,* 272 Or 210, 219, 536 P2d 512 (1975). We know of no reason, and defendant has pointed to none, whereby a businessman or corporation dealing with another businessman or corporation should not be held to reasonably high standards, and such standards do not include fraud or deceit. The jury found that the defendant had acted fraudulently. Under the facts of this case, the court did not err in submitting the issue of punitive damages to the jury.

Affirmed.