Argued May 2, affirmed June 28, 1973, part of former opinion
withdrawn, reversed in part; affirmed on petition
for rehearing February 14, 1974

# MYER ET UX, *Respondents and Cross-Appellants, v.*
# E. M. ADAMS & CO. ET AL, *Appellants and Cross-*
# *Respondents.*

511 P2d 841
519 P2d 375

Holman, J., did not participate in the decision of this case.

R. *Alan Wight,* Portland, argued the cause for appellants and cross-respondents. On the briefs were Norman J. Wiener, J. David Petersen, and Miller, Anderson, Nash, Yerke & Wiener, Portland.

*Marvin S. Nepom,* Portland, argued the cause for respondents and cross-appellants. With him on the brief was Leo Levenson, Portland.

BRYSON, J.

Plaintiffs purchased shares of stock in TiLINE, Inc., from defendant E. M. Adams & Co., an Oregon brokerage house, through defendant Donald Bruce, its sales representative, as follows:

| | | | |
|---|---|---|---|
| 12/20/67 | 3,500 shares @ $2.50 | per share |
| 5/3/68 | 1,000 shares @ 4.125 | per share |
| 1/6/69 | 2,000 shares @ 8.625 | per share |

Plaintiffs brought this suit to rescind the above purchases and allege they were induced to buy the stock by the material misrepresentations of defendant Bruce. The court found that plaintiffs were entitled to rescind the third purchase only and ordered defendants to return the purchase price in that transaction to plaintiffs. Defendants Bruce and E. M. Adams & Co. appeal from the adverse decree.[1] Plaintiffs cross-appeal from the decree insofar as it denies rescission of the first and second stock purchases.

Plaintiffs met defendant Bruce in the fall of 1967 when Bruce inquired about purchasing plaintiffs'

---

[1] Albert Hawn, president of E. M. Adams & Co.; and Richard Langton, the executive vice-president of E. M. Adams & Co., were originally named as defendants but are not parties to this appeal.

home. During October 1967 defendant Bruce offered to sell plaintiffs some shares of stock in the TiLINE corporation which Bruce knew would be offered through the offices of E. M. Adams & Co. TiLINE was a new over-the-counter issue which would be offered to residents of Oregon only at $2.50 per share. After several meetings and discussions, the first sale was consummated.

There was a conflict of testimony concerning the representations made by defendant Bruce at these meetings. Plaintiffs testified that Bruce stated that there was a highly confidential letter in the E. M. Adams & Co. office from The Duriron Company, Inc., of Dayton, Ohio, to TiLINE. The letter, according to plaintiffs, was supposed to contain an offer to buy out TiLINE's stock within two years at $20 per share. Plaintiff Robert Myer testified that he asked to see the letter but that defendant Bruce refused, saying "it was too risky, too dangerous * * *."

Defendant Bruce denied that he made these representations and stated that he did not learn of the letter until February 1968, after plaintiffs had completed their initial purchase.

As a matter of fact, TiLINE had received a letter from Duriron under date of September 25, 1967. The letter expressed Duriron's considerable interest in TiLINE's ability to produce titanium castings of superior quality and Duriron's desire to purchase TiLINE's titanium products. The letter also stated that when TiLINE perfected the manufacturing process Duriron would consider purchasing an option on 80 percent of the TiLINE stock.

After the second purchase of stock, on May 3, 1968, plaintiffs moved to San Rafael, California. In

December 1968 plaintiffs asked defendant Bruce to sell them additional shares in TiLINE. Bruce declined because plaintiffs were no longer residents of Oregon. According to plaintiffs, defendant Bruce represented to them that TiLINE would be "going interstate" sometime that month. Plaintiff Robert Myer testified that on December 27, 1968, defendant Bruce stated that TiLINE would "go interstate" on January 6, 1969, and that plaintiffs, as California residents, could purchase TiLINE stock at that time. On January 6, 1969, plaintiffs made their third and final purchase.

The trial court found that plaintiffs were entitled to rescind their final purchase of 2,000 shares because of the falsity of the representation that TiLINE was going to "go interstate."② On appeal, defendants contend that this finding is unsupported by any evidence.

The Securities Act of 1933 exempts from its

---

② The court made the following special findings of fact:

"10. On December 27, 1968, plaintiffs, who were then residents of the state of California, contacted defendant Bruce and arranged a meeting in Portland, Oregon, to discuss the further acquisition to TiLine, Inc., stock. At such meeting, Bruce told the Myers 'that the TiLine was going to go interstate,' that 'this would open up a much wider field of potential sale for the stock and it certainly would be of interest to people outside of this area. He could sell to friends in South Dakota, to a doctor friend he had in San Diego, to other people, as could all other representatives who were interested in selling TiLine stock,' * * *. Bruce did not further explain the meaning of the words 'going to go interstate.' The Myers reasonably understood such statement to mean that the Tiline, Inc. stock would meet all legal requirements for interstate sale of securities by dealers or individuals.

"* * * * *.

"14. That the statements made to the Myers by Bruce as set forth in paragraph 10 above, and the innuendo of such statements as understood by the Myers, were false and were known by Bruce to be false when made, or were made by Bruce without regard to their truth or falsity."

coverage those securities transactions which are essentially local in character:

"(a) Except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities:

"* * * * *.

"(11) Any security which is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory." 15 USCA § 77c (a) (11) (West 1971).

The management of TiLINE and defendant E. M. Adams & Co. relied on this so-called "intrastate exemption" in offering the stock of TiLINE to residents of Oregon only.

In Securities Act Release No. 33-4434, 26 Fed Reg 11896 (1961), the Securities and Exchange Commission restated its long-held view that the intrastate exemption is not defeated by resale of the securities to nonresidents so long as the entire issue has "come to rest" in the hands of residents. After discussing the ways in which the exemption could be lost, the Commission stated:

"This is not to suggest, however, that securities which have actually come to rest in the hands of resident investors, such as persons purchasing without a view to further distribution or resale to nonresidents, may not in due course be resold by such persons, whether directly or through dealers or brokers, to nonresidents without in any way affecting the exemption. The relevance of any such resales consists only of the evidentiary light which they might cast upon the factual question whether the securities had in fact come to rest in the hands

of resident investors. If the securities are resold but a short time after their acquisition to a nonresident this fact, although not conclusive, might support an inference that the original offering had not come to rest in the State, and that resale therefore constituted a part of the process of primary distribution; * * *." *Id.,* 26 Fed Reg at 11897 (1961).

In *Brooklyn Manhattan Transit Corp.,* 1 S.E.C. 147 (1935), the Commission suggested that in determining when the initial offering had come to rest in the hands of residents, it would presume, subject to refutation, that the distribution was completed within one year of the first date of the public offering. See L. Loss, Securities Regulation 597 (2d ed 1961). As a practical matter, purchasers of an intrastate offering are free to resell their securities at the end of one year from the first date of the offering. L. Loss, *supra;* Emens and Thomas, *The Intrastate Exemption of the Securities Act of 1933 in 1971,* 40 Cinn L Rev 779, 786-87 (1971); Schaefer, *An Annotated Checklist for the Federal Intrastate Exemption from Registration of Securities,* 4 Mont L Rev 1, 8 (1973).

■ TiLINE stock was originally offered for sale on December 20, 1967, and the entire issue was distributed on that date. Defendants followed the safe course of waiting until one year had passed in order to avoid jeopardizing the intrastate exemption with a charge that the stock had been purchased by parties who took the securities with an intent to resell to nonresidents. The stock was therefore available for interstate trading on December 20, 1968. Defendant Bruce's representation that "TiLINE was going to go interstate" on January 6, 1969, was, but for the date, perfectly true. On December 20, 1968, TiLINE's stock did,

in fact, "meet all legal requirements for interstate sale of securities by dealers or individuals."

There is convincing evidence that plaintiffs relied on Bruce's statement that TiLINE would be "going interstate." Technically, there is a difference between "going interstate" and making "an interstate offering" of corporate shares. The trial court, in its special findings, found, in effect, that Myers relied on this statement in the context that there would be "an interstate offering" and "the innuendo of such statements as understood by the Myers, were false and were known by Bruce to be false when made, or were made by Bruce without regard to their truth or falsity." The statement of defendant Bruce that TiLINE would be "going interstate" was never explained to the plaintiffs. Plaintiffs did not know of the technicality that allowed resale of the stock when the entire issue had "come to rest" in the hands of Oregon residents. In the context that the stock would be an "interstate offering," Bruce's unexplained statement would be a half truth. After one year there is a presumption, subject to refutation, that the stock had "come to rest" and could be sold interstate. It is not a conclusive "interstate offering" in the sense that plaintiffs understood the statement. A half truth can sometimes be more misleading than an outright untruthful statement. *See Krause v. Eugene Dodge, Inc.,* 265 Or 486, 505, 509 P2d 1199, 1208 (1973); *Parker v. Title and Trust Co.,* 233 F2d 505, 510 (9th Cir 1956). *Cf. Pennebaker v. Kimble et al,* 126 Or 317, 322, 269 P 981 (1928).

■ We conclude, as did the trial court, that there is strong and convincing evidence that defendant Bruce made false representations of material facts or half truths of material facts to plaintiffs and that there

was reliance thereon by plaintiffs. No error was committed in this respect.

On cross-appeal, plaintiffs contend that the trial court erred in finding that there was no probative evidence to support plaintiffs' claim that their stock purchases on December 20, 1967, and May 3, 1968, were made in reliance on untrue statements of material facts by the defendants. In short, plaintiffs disagree with the trial court's refusal to find that defendant Bruce misrepresented the contents of the Duriron letter.

■ The trial court reached its conclusion purely on the basis of conflicting testimony. Pursuant to ORS 19.125 (2), this court considers the cause de novo upon the record. In *Kallstrom v. Kallstrom,* 265 Or 481, 509 P2d 1195 (1973), we were faced with a similar request to retry a factual issue in an equity suit where the court reached its decision on the basis of conflicting evidence, and refused to reverse, citing *Martin v. Good,* 234 Or 291, 296, 381 P2d 713, 715 (1963). We have reviewed the evidence and conclude, as did the trial court, that the plaintiffs are not entitled to rescission on their first two purchases of shares of stock in TiLINE, Inc.

Affirmed.

**ON PETITION FOR REHEARING**

*R. Alan Wight,* Portland, argued and reargued the cause for appellants, cross-respondents. On the briefs were Norman J. Wiener, J. David Petersen, and Miller, Anderson, Nash, Yerke & Wiener, Portland.

*Marvin S. Nepom,* Portland, argued and reargued the cause for respondents, cross-appellants. With him on the briefs was Leo Levenson, Portland.

BRYSON, J.

Plaintiffs sued to rescind three separate stock purchases, and the trial court decreed rescission of the third purchase only. The court found that the Myers had been induced to make that purchase by defendant Bruce's representation on December 27, 1968, that the TiLINE, Inc., stock was "going to go interstate." The court further found that this representation and its

innuendo as understood by the Myers were false. On appeal, this court affirmed the trial court's decree.

The defendants petition for rehearing, contending that there was no evidence that Myers misunderstood the statement "going interstate" made by defendant Bruce to plaintiffs and that plaintiffs did not *rely* on an erroneous statement in purchasing TiLINE stock. We granted a rehearing to again review the sufficiency of the evidence.

■ ■ A representation that a certain stock is going to go interstate is ambiguous. The phrase can indicate that the stock will become available for nationwide distribution as the result of an interstate registration with the Securities and Exchange Commission. The phrase can also indicate that the stock will qualify for interstate sale through a completed distribution of the stock to residents of a single state coupled with either: (1) convincing proof that the entire issue has come to rest in the hands of residents who have purchased for investment purposes only and without a view to resale, or (2) the expiration of one year from the first date of the intrastate offering.[1]

---

[1] In determining whether a stock qualifies for interstate sale through a consummated intrastate distribution, the test is whether the stock has come to rest in the hands of resident investors who have purchased without a view to further distribution or resale. S.E.C. Securities Act Release No. 33-4434, 26 Fed. Reg. 11896 (1961). The Commission presumes, subject to refutation, that the sales of dealers within one year of the first date of the offering are part of the process of primary distribution. Brooklyn Manhattan Transit Corp., 1 S.E.C. 147, 162-63 (1935). Where there is proof that the stock has in fact come to rest, the stock may be traded to nonresidents without affecting the intrastate exemption. S.E.C. Securities Act Release No. 33-4434, *supra*. A general rule has developed from the *Brooklyn Manhattan Transit* case that resales to nonresidents more than one year from the first date of distribution are permitted, although there is little actual authority for this practice in the official releases of the S.E.C. *See* Schaefer, *An Annotated Checklist for the Federal Intrastate Exemption from Regis-*

At the trial of this case, plaintiff Robert Myer testified concerning Bruce's explanation of the phrase "going to go interstate" as follows:

"Q. What were those that you were relying on at that time? What were the key statements that you were relying on?

"A. One of the very key statements at this time was that it was going to go interstate at this date and this would open up a much wider field of potential sale for the stock and it certainly would be of interest to people outside of this area. He could sell to friends in South Dakota, to a doctor friend he had in San Diego, to other people, as could all other representatives who were interested in selling TiLINE stock.

"Going interstate certainly would be an asset to TiLINE. And it would be important to them as a stock, the value of the stock, certainly could then be sold to more people and become more valuable.

"* * * * *

"Q. At that meeting, did he tell you what that meant?

"A. I will assure you that he had earlier told me what that meant and I would very well imagine that many of these points were reiterated at that time.

"One of them would probably be, knowing that he was from South Dakota, at that time that he could now go back there and sell stock of the TiLINE and ——

"Q. All right. Now, previously, what did he tell you that the word 'interstate' meant?

"A. He had told us that going interstate would allow such as myself to be able to now buy the stock as being a resident of another state.

"* * * * *

*tration of Securities*, 34 Mont L Rev 1, 8 (1973); but *cf.* Emens & Thomas, *The Intrastate Exemption of the Securities Act of 1933 in 1971*, 40 Cinn L Rev 779, 786 (1971): "[R]esales to nonresidents more than one year after distribution has *ended* are acceptable." (Emphasis added.)

"Q. Would you explain that, please?

"A. Well, Don told us that the stock of TiLINE was going interstate. That is, it would be sold nationally; that he, Don Bruce, for instance, could go out to South Dakota and solicit—where he had come from—and solicit sales. He could go down to California. It would become a national thing where, up until now, he had been restricted to the State of Oregon."

This testimony demonstrates that Myer understood Bruce to mean that after a certain date, brokers and individuals could sell TiLINE stock to nonresidents of Oregon. The record contains no indication that Myer ever inquired, or that Bruce ever explained the various methods by which TiLINE stock could qualify for interstate sale. Myer's testimony does not demonstrate a particular concern for the method by which TiLINE stock would so qualify. Myer relied on the qualification of TiLINE stock for interstate sale; he did not rely on such a qualification by means of an S.E.C. registration or by any other particular means.

■ The TiLINE stock did qualify for interstate sale, and thus Bruce's representation that TiLINE was "going to go interstate" was true. Therefore, there was no reliance on an alleged erroneous statement by defendants because the stock could be sold in interstate transactions; Myers' final stock purchase was transacted while they were residents of California and they could dispose of the stock in the same manner. We therefore conclude there is no evidence that Bruce's representations suggested a false innuendo to the Myers or that defendants detrimentally relied on a falsehood. The decree of the trial court is reversed in this respect.

Part of former opinion withdrawn. Reversed in part; affirmed in part.