Argued and submitted January 22, reversed and remanded on appeal with instructions to reinstate the verdict and enter judgment thereon; affirmed on cross-appeal March 28, reconsideration denied August 1, petition for review denied September 18, 1990
(310 Or 393)

## DONALD H. HARTVIG, INC.,
*Appellant - Cross-Respondent,*

*v.*

## CLACKAMAS TOWN CENTER ASSOCIATES,
*Respondent - Cross-Appellant.*

(83-3-422; CA A49514)

789 P2d 679

Jacob Tanzer, Portland, argued the cause for appellant - cross-respondent. With him on the briefs was Ball, Janik & Novack, Portland.

Lee Aronson, Portland, argued the cause for respondent - cross-appellant. With him on the briefs was Schulte, Anderson, DeFrancq, Downes & Carter, P.C., Portland.

Before Graber, Presiding Judge, and Riggs and Edmonds, Judges.

## GRABER, P. J.

This is an action for damages for fraud in the inducement of a lease. Plaintiff appeals from a judgment notwithstanding the verdict on its claim for punitive damages. We reverse.

In reviewing a judgment notwithstanding the verdict, we view the evidence in the light most favorable to the party in whose favor the jury rendered its verdict. *Roberts v. Coleman et al,* 228 Or 286, 288, 365 P2d 79 (1961). Plaintiff is the trustee in bankruptcy of Sanford's, Inc., the owner of a chain of children's clothing stores (Sanford's). Clackamas Town Center (Center) is a shopping mall owned by defendant, a limited partnership. A branch of Sanford's opened in the Center in April, 1981, and closed in April, 1983. In March, 1982, a second children's clothing store opened in the Center. Plaintiff claims that defendant fraudulently induced Sanford's to sign the lease by promising that it would be the only children's clothing store in the Center.

In 1979, defendant retained Coldwell Banker as its leasing agent for the Center. Will Johnson was the Coldwell Banker person responsible for leasing to stores selling ready-to-wear clothes, including children's wear. Roy Lind and Bob Van Horn negotiated for Sanford's. They, along with Betty Lind, Roy's wife, operated Sanford's. Van Horn testified that Johnson

"invited us to be the only children's wear store that would have space in the center. * * * It would be one children's wear store, that their leasing plan only called for one children's wear. They had a plan they drew up ahead of time. They desired only one store, so, it was exactly that way. They desired one, and they chose us to be that one."

On October 23, 1980, Johnson wrote a letter to Sanford's attorney, in an attempt to facilitate the leasing effort. In it, he said: "We have one children's store scheduled for the mall, and if Sanford's cannot be opened, we will be forced to seek an alternate store." It was important to Sanford's to be the only children's store in the Center. Sanford's insistence on that point caused tension with Johnson. During one conversation, according to Roy Lind, Johnson "pulled a drawer open in his desk and reached in and pulled out a bunch of papers and slammed them on the desk, and said 'Do you want to be the

children's shop, or don't you? Do you want [me] to talk [to] other people or not?' " The testimony that Johnson had offered an exclusive to Sanford's was corroborated by the testimony of another retailer of children's clothing, who said that Johnson made the same offer to him at a time when the negotiations with Sanford's were stalled.

As the Center's opening date approached, the lease still was not signed, because Sanford's wanted assurances that it would be the only children's clothing store in the Center. Therefore, in December, 1980, Roy Lind called Doyle, a vice-president of development for the corporate general partner in the defendant limited partnership, at the suggestion of Johnson. Doyle was out, and Lind left a message. At about the same time, Johnson told Doyle about Sanford's desire to be the only children's clothing store at the Center and suggested that Doyle call Lind. When Doyle reached Lind by telephone, Lind told him that "Sanford's didn't want to go into the [C]enter unless they were the only children's ready to wear store." Lind testified that Doyle "said that I didn't have anything to worry about. In fact, the tenor of the conversation was, 'Roy, you don't have anything to worry about.' "[1] According to Lind, Doyle told him that there "wasn't going to be another kid's shop, period."

On December 29, 1980, a letter followed up on the telephone conversation:

"Dear Mrs. [Lind]:

"In a telephone conversation this morning with your husband, concern was expressed regarding the possibility of another children's ready-to-wear store at Clackamas Town Center.

"At Clackamas, as in all of our centers, we have established a merchandising mix which we feel is appropriate for both the center and the trade area. This mix often calls for the duplication of many different types of merchandise in order to provide comparative shopping and add to the critical mass merchandising concept of the project. The tenant mix analysis for Clackamas currently calls for only one full-line children's ready-to-wear operation. Mrs. [Lind], I can see no reason at this time to believe that we would be considering an additional operation similar to yours.

---

[1] Doyle's recollection of the conversation differed.

"Ernest W. Hahn, Inc., and Hahn Property Management Corporation, [partners in defendant] are aware of the large capital expenditures required to open stores in our malls. Of equal importance, we, the developers, are dependent upon your success in generating the necessary overage rents to provide an acceptable return on our investment. Therefore, our relationship is one of mutual benefit.

"I hope this note will alleviate your concerns. We look forward to a long and outstanding relationship at Clackamas Town Center.

"Sincerely,

"William H. W. Doyle, CSM

"Vice President, Development"

The lease was executed in January, 1981.

The "merchandising mix" referred to in Doyle's letter was a leasing plan called the "tenant mix analysis" (TMA). Johnson and other members of a "leasing team" met every three weeks with Doyle to discuss their progress and to plan future leasing efforts. The team developed the TMA, which listed categories of stores and types of stores within those categories that the leasing team wanted to acquire as tenants.

What the telephone call to Lind and the letter did not say was that the TMA, which Doyle cited as the assurance that Sanford's would be the only children's ready-to-wear store, was something that the Center "felt free to exceed or to act beyond," according to Doyle's testimony. Furthermore, in attempting to alleviate Lind's concerns about competition, Doyle did not "tell him that if a high line or more expensive goods children's store came along," defendant would rent space to it.

Sanford's opened in April, 1981. Four months later, representatives of a new children's store, Lads and Lassies, approached the Center's management. In December, 1981, Lads and Lassies signed a lease for space in the Center; in March, 1982, the store opened. The TMA that Johnson and Doyle had cited to relieve Sanford's concern about a competing store had never been formally changed to call for another children's store.

Although Johnson told Sanford's that it would be the only children's clothing store at the Center, he testified that

he intended from the start to have two or three such stores. He did not recall whether he discussed that intention at the leasing team meetings, which Doyle attended, but he testified that it was the kind of topic that he ordinarily would have discussed there.

Plaintiff could prevail on its fraud claim by showing either that defendant had no present intent to perform when it made the promise or, alternatively, that defendant made the promise with reckless disregard as to its ability to perform. *Webb v. Clark,* 274 Or 387, 393 n 2, 546 P2d 1078 (1976).[2] Punitive damages were appropriate if defendant's promise was intentionally false, but not if it was only reckless and was made without aggravating factors. *McMullin v. Murphy,* 89 Or App 230, 234 n 3, 748 P2d 171, *rev den* 305 Or 576 (1988).

With regard to punitive damages, the trial court instructed the jury that it "must first determine whether defendant was guilty of wanton misconduct that caused damage to the plaintiff. Wanton misconduct is conduct amounting to a particularly *aggravated, deliberate* disregard to [*sic*] the rights of others." (Emphasis supplied.) The verdict form instructed the jury that, if there was no fraud, it was not to consider punitive damages. With respect to fraud, the jury was instructed on both intentional and reckless fraud. We presume that the jury followed the instructions. *State v. Minnieweather,* 99 Or App 166, 171, 781 P2d 401 (1989). Under the instructions given, the jury could not have found mere reckless fraud, which would have been insufficient to sustain punitive damages; the necessary inference is that it must have found intentional fraud instead.

We next consider whether there was evidence from which the jury could have found intentional fraud.[3] The jury could have found that defendant made representations to Sanford's that were only half truths, in order to induce it to

---

[2] A fraudulent statement need not be entirely false. One who discloses a partial truth in an attempt to induce reliance has an affirmative duty to disclose fully. *Krause v. Eugene Dodge, Inc.,* 265 Or 486, 505, 509 P2d 1199 (1973).

[3] This case differs from *Whinston v. Kaiser Foundation Hospital,* 309 Or 350, 788 P2d 428 (1990). Here, unlike in *Whinston,* there was sufficient evidence to support the theories of both reckless and intentional fraud. As discussed in the text, the jury implicitly found intentional fraud. This is not a case in which "we can't tell" whether the jury awarded damages on a claim for which there was no evidence. 309 Or at 357.

sign a lease and that, when Johnson said that Sanford's would be the only children's wear store, he intended there to be more than one. Because Johnson met with the leasing team every three weeks and usually discussed plans with them, the jury could also have found that the leasing team as a whole, including Doyle, shared the plan to have more than one store. The jury could understand Doyle's letter and his conversation as assuring Sanford's that there was no reason to believe that the Center would add another children's store, when he knew that there *was* a reason to believe so. That evidence is "sufficient to establish intentional fraud [and] is also necessarily sufficient to support the requisite findings for the imposition of punitive damages, without additional or independent evidence pertaining to the culpability of the defendant's conduct or state of mind." *McMullin v. Murphy, supra,* 89 Or App at 234. (Emphasis deleted.) Therefore, the trial court erred in granting the judgment notwithstanding the verdict.

Defendant cross-appeals and raises three assignments of error. We are not persuaded by its arguments and affirm on the cross-appeal without discussion.

Reversed and remanded on appeal with instructions to reinstate the verdict and enter judgment thereon; affirmed on cross-appeal.