Belknap,
No. 4496.

HAVEN LLOYD FITZPATRICK & a.

*v.*

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE.

Argued January 4, 1957.

Decided May 9, 1957.

*Sheehan, Phinney, Bass, Green & Bergevin* and *Bernard I. Snierson* (*Mr. Green* orally), for the plaintiffs.

*Sulloway, Hollis, Godfrey & Soden* (*Mr. Soden* orally), for the defendant.

LAMPRON, J.  There was evidence from which it could be found that the fire was caused solely by the negligence of the defendant and its motions for nonsuit and directed verdict were therefore properly denied.

A vendor of electricity engaged in the distribution of current over its lines to consumers is bound to exercise due care in the construction, maintenance and inspection of its lines. *Davenport* v. *Company*, 92 N. H. 20, 22.  The test of due care is what reasonable prudence would require under the circumstances. *Bouley* v. *Company*, 90 N. H. 402.

There was evidence that defendant's employees were instructed to install wires so they will not come in contact with anything in order to prevent danger to property.  In installing wires they "like to keep away from buildings or anything where someone might accidentally get into it or hit it."  There was also testimony that it is not a desirable condition to have wires coming in contact with anything and that if there is such a contact it means that something is wrong and should be changed because of potential danger.  It was also in evidence that when the service was installed in 1932 there was a discussion with the previous owner of the premises about putting a pole between the line pole and the ell and

that defendant would "rather have had one." However because the customer did not want one it was left out.

There was also evidence that four times between the date of installation and the fire the defendant was called by an occupant of the farm to raise the wires. On those occasions the wires had sagged so that they either were striking the ice house or one was looped over its northerly lightning rod or they were obstructing entrance to the upper barn. A few weeks before the fire the wires were observed hanging at a point about halfway down the northerly rod head of the ice house.

On the above evidence the jury could find that defendant was negligent in the installation or maintenance of its wires on plaintiffs' premises. *Bourget* v. *Company*, 98 N. H. 237, 243; *Davenport* v. *Company, supra.*

An expert called by plaintiffs testified that in his opinion the fire was caused because defendant's copper service wires were so situated that one or more of them could blow over and contact the lightning rod head at the northerly end of the ice house and when in that position would establish an electric arc between the copper lightning rod head and the body of the wire itself, producing an emission of sparks onto the dry shingled roof of the ice house which would catch on fire very readily. Upon that happening he testified that the lightning rod would be burned like the rod found at the north end of the ice house after the fire. Also that the electric arc would cause a fusion between the copper braid and the metal skirt around the base of the ice house like that found at the northwest corner of the ice house after the fire. Another expert witness agreed that this latter fusion was caused by electricity as was the fusion of a copper conductor of the type used in the electric service wires with a piece of lightning rod copper braid which he observed near the northwest corner of the ice house at the time of the fire.

Defendant maintains that there was absolutely no evidence that any wire ever hit a lightning rod at the time of the fire or that even if a wire did hit a rod that it remained in contact with such rod. It maintains further that there was no evidence that current, if it was on, escaped to the rod or that the ice house caught on fire contemporaneously with any of the foregoing events, even if they could have been proved. It states in its brief that "careful analysis of the testimony of these experts will readily demonstrate that the verdicts herein were based on sheer speculation, and, in part, at least, they are based on a physical impossibility."

There was evidence that defendant had to take up the slack in the wires on four occasions previous to the fire. Also that a few weeks before the fire they were sagging so that instead of being even with the top of the northerly lightning rod as they were when installed the wires were hanging at a point about half way down the rod. There was further evidence that on one occasion in 1950 plaintiffs "were coming in from the field, the wind was blowing very hard, and we noticed the wire was caught on the south side of the lightning rod." One of the plaintiffs took a wooden rake and "pulled or pushed it off." This evidence would sustain a finding by the jury that one of the wires blew over and came in contact with the northerly lightning rod on the ice house on the day of the fire and that it remained in contact with said rod. *Emery* v. *Company*, 89 N. H. 165.

Defendant introduced evidence that the circuit serving plaintiffs' premises was de-energized from 1:30 to 2:15 P. M. However one of the plaintiffs testified that at about 1:45 P. M. he heard the click of an electric water pump. There was also evidence that if "molten sparks were emitted from a contact between a copper secondary wire and a copper air terminal on the top of the ice house so that sparks fell onto a shingled roof . . . a blaze . . . could take place in a matter of minutes" and "it could also smoulder for some time and flare up later on." When one of the plaintiffs first saw the fire the ice house roof was practically gone although its walls were not burning at all. The roof of the silo east of it was afire but not its walls and the upper barn east of that had not yet caught on fire. On that evidence the jury could find that the fire started on the roof of the ice house and that the electric current was on at a time when it could have caused the fire.

To prove that defendant's negligence caused the fire plaintiffs introduced expert opinion that a lightning rod found among the ruins at the north side of the ice house was burned by an electric power current. Also that the fusion found at the northwest corner of the ice house between braided copper wires used as a conductor for lightning rods and the metal at the base of the ice house was also caused by the same medium. There was further evidence that an electric wire observed at the time of the fire fused to a lightning rod cable on the ground resulted from the action of an electric current and not from exposure to an ordinary flame. On the basis of that and other evidence an expert witness gave as his opinion that the fire was caused by one of the defendant's copper

service wires coming in contact with the lightning rod on the northerly end of the ice house and thus establishing an electric arc between the copper lightning rod head and the body of the wire itself producing an emission of sparks onto the dry shingled roof of the ice house thus setting it on fire.

Defendant takes the position that it was error to submit to the jury the issue of its negligent causation of the fire "on the basis of the speculations of two experts based upon the physical appearance of three objects, two of which were produced in court . . . and one of which was not. Careful analysis of the testimony of these experts will readily demonstrate that the verdicts herein were based on sheer speculation, and, in part, at least, they are based on a physical impossibility."

The chief expert witness for plaintiffs testified, that the arcing which caused the burning of the lightning rod as it was found in the ruins and the fusing of the braid to the sheet metal around the base of the ice house was produced by an electric current having "a large number of amperes." The minimum, he said, being 20 amperes. According to a formula admitted by all parties to be accurate, the ground resistance measured in ohms would have to be about 5.5 for a 110 volt current to produce a flow of 20 amperes and any increase in the ground resistance would cause a corresponding decrease in the number of amperes. Readings taken on the premises by the defendant at different times after the fire showed the ground resistance to be never less than 100 ohms and sometimes in excess of 500. Defendant therefore maintains that the jury would be speculating if on the evidence they found that its wires caused the fire and that such a verdict would also be based on a physical impossibility. *Russell* v. *Railroad,* 83 N. H. 246; *Brown* v. *Mailhot,* 89 N. H. 240, 241.

Plaintiffs' expert testified that he never took a ground reading because the ground conditions existing on the day of the fire could never again be duplicated especially with the abnormal rainfall in March and May and that any reading taken thereafter would be of little value in the present case. He testified further that in addition to the two copper braid grounds the metal sheathing at the base of the ice house was also an effective ground for the lightning rod system and would tend to increase the amount of current running to ground and that a flow of enough amperes would be produced to cause the conditions which were the basis of his opinion. It is not a matter of common knowledge that such a

condition would not exist. *Dade* v. *Railroad*, 92 N. H. 294, 297. On the evidence it was for the jury to adopt plaintiffs' or defendant's evidence. *Davenport* v. *Company, supra*. Their conclusion that defendant's negligence caused the fire was proper as a direct inference from the testimony (*Worthen* v. *Abbott*, 90 N. H. 164, 166; *State* v. *Railroad*, 99 N. H. 66, 70) and was strengthened by the absence of any other explanation for the origin of the fire. *Ballas* v. *Company*, 90 N. H. 428, 433.

Defendant argues to the same effect that "the undisputed evidence" is that the copper lightning rod braid at the northwest corner of the ice house went down a corner board three quarters of an inch thick which ran over the metal sheathing around the bottom and prevented the braid from coming in contact with it or being in close proximity to it as assumed by plaintiffs' expert in describing the arc which caused the fire. The latter having admitted that if the braid were 4 inches away from the sheet iron a 110 volt current would not jump the gap, defendant argues that the evidence shows such a gap and that the witnesses' theory of arcing as proof that the fire was caused by defendant is based on a physical impossibility.

There was evidence that upon installation of the system a ground was placed at the northwest corner of the ice house and that the metal braid from the northerly lightning rod came down the northwest corner of the building and went into the ground beside a post or stake. This braid ran down along a three-quarter inch corner board which as far as it extended separated the braid from the metal sheathing around the bottom of the ice house. However the corner board ended 4 or 5 inches from the ground but the braid continued to the ground. There was introduced in evidence a piece of copper braid such as the above which after the fire was found fused to the metal sheathing at the bottom of the ice house at its northwest corner. It was testified that this fusion resulted from an electric arc. This was a sufficient basis for the jury to find that the braid was in sufficiently close proximity to the metal at the base of the ice house to support the expert opinion that the defendant's copper wire having come in contact with the northerly lightning rod created an electric arc of sufficient amperes to produce the results observed after the fire and to cause the fire itself. Such a verdict would not be based on a physical impossibility as there was no evidence to require a finding that the braid was 4 inches from the metal sheathing after it left the corner board. On the

contrary one of the plaintiffs testified that when the braid reached the end of the board "it went right off over to . . . right into the ground."

This also disposes of defendant's similar contention that the braid and the metal around the bottom of the ice house were at the same potential and it was therefore impossible for arcing to take place. There was evidence which the jury could adopt that even though by their nature there is not much difference in potential between these metals "it soon creates difference of potential for itself" after such a metal is installed in place.

The Court excluded the following question asked of one of the plaintiffs. "Did you ever consider putting a wooden board or something up at the peak of that ice house to keep the wires from blowing against it if you thought they were too low?" Defendant was under duty to use due care in the installation, maintenance and inspection of its wires. The maintenance of these lines was primarily its lookout (*Davenport* v. *Company, supra,* 22), and it was its duty to take steps to prevent its wires from blowing against the ice house. It is true, as the Court charged the jury, that plaintiffs were also bound to exercise due care under all the circumstances. The question was material only as it related to the danger of fire due to sagging wires. However there was no evidence that plaintiffs knew or should have known that sagging wires constituted a danger of fire to their premises. No fire had resulted from the previous contact of defendant's wires with the lightning rod. *Derosier* v. *Company,* 81 N. H. 451, 468. Therefore this question was properly excluded. We cannot say on the evidence that the plaintiffs were contributorily negligent as a matter of law.

Evidence of slack in the wires on sundry occasions between 1932 and 1945 was relevant on the issue of how defendant maintained its wires from their installation to the day of the fire and it was for the Trial Court to decide whether it was too remote to be admitted. *Merchants Mutual Cas. Co.* v. *Smith,* 91 N. H. 204, 206.

Defendant maintains that in a hypothetical question one of plaintiffs' expert witnesses "was being asked to assume as facts what actually were simply opinions previously expressed by the same witness. It was a clear instance of pyramiding one inference upon another." We find the question proper. The basis of a hypothetical question may be either data observed by the witness himself or by others (who have testified thereto) or inferred data

presented by expert testimony of the witness himself or of others. II Wig. Ev. (3rd *ed.*), *s.* 682, *p.* 810. The witness had given as his opinion that the condition of certain objects found at the scene of the fire resulted from the action of an electric current. These conclusions were proper data to be included in the hypothetical question among the premises to be considered by him in giving his expert opinion as to the cause of the fire to plaintiffs' property. *L'Esperance* v. *Sherburne,* 85 N. H. 103, 114.

Defendant excepted to the failure of the Court to charge that the jury should return a verdict for it if they believed defendant's evidence as to ground resistance readings, also that the jury could not find that the fire was caused by a service wire hitting a lightning rod in the absence of evidence of ground readings low enough to produce a minimum of 20 amperes. These requests were predicated mainly on defendant's theory that a verdict on the evidence as presented would be based upon a physical impossibility. In view of what has been said on this matter earlier in this opinion these exceptions are overruled. In view of the evidence that sparks could have smouldered on the roof before flaring up the exception to the Court's refusal to charge as requested that if the jury found that the current was off between 1:30 to 2:15 P. M. there must be a verdict for defendant is overruled.

*Exceptions overruled.*

WHEELER, J., took no part in the decision; the others concurred.