Argued December 1, 1975, affirmed July 9, petition for rehearing denied
August 3, 1976

MYERS, *Respondent,*

*v.*

CESSNA AIRCRAFT CORPORATION, *Defendant,*
ROBERTSON AIRCRAFT CORPORATION,
*Appellant.*

553 P2d 355

[ 502-a ]

[ 502-b ]

[ 502-c ]

[ 502-d ]

*Kenneth E. Roberts,* Portland, argued the cause for appellant. With him on the briefs were Ridgway K. Foley, Jr., and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland; and Kenneth C. Miller, of Lord, Bissell & Brook, Chicago, Ill.

*Robert B. Hopkins,* Portland, and *Martin Schedler,*

Portland, argued the cause for respondent. With them on the brief were David W. Harper, and Keane, Haessler, Harper, Pearlman and Copeland, Portland.

Before O'Connell,* Chief Justice, and McAllister, Denecke,** Holman, Howell, and Bryson, Justices.

HOWELL, J.

*Chief Justice when case was argued.
**Chief Justice when case was decided.

## HOWELL, J.

This is a wrongful death action arising out of the crash of a light airplane in British Columbia during a flight from Hillsboro, Oregon to Kimberley-Cranbrook, B.C. in September, 1970. The plaintiff, Mary Myers, is the administratrix of the estate of her husband, Clifford, a passenger who died in the crash. Defendant Cessna Aircraft Corporation is the manufacturer of the plane, and defendant Robertson Aircraft Corporation made some modifications on the plane prior to the flight to British Columbia. Plaintiff's complaint alleged causes of action for negligence and strict liability against each defendant. Following a jury trial, a verdict was returned against Robertson alone. Robertson appeals from the judgment entered on the jury's verdict.[1]

The airplane involved in this crash was a Cessna T337B. Robertson performed a short take-off and landing (STOL) modification on the plane at its Washington plant in 1969. A STOL modification is designed to permit better slow flight characteristics and shorter take-offs and landings. It involves modifications of the wing design and other component parts. One of these modified components, the pitot tube, is the center of the controversy in this appeal.

The pitot tube is an L-shaped metal tube which hangs below the left wing of the plane. Its function is to measure the speed of the aircraft through the air mass. This speed is registered on the "air speed indicator" which compares the pressure of the air mass impacting on the pitot tube with the pressure of undisturbed air at the same altitude, as measured by the "static source pressure system." The pitot tube is equipped with a heating element designed to prevent ice formation in the pitot tube in the event that icing conditions are inadvertently encountered during flight. If ice were to form in the pitot tube, the reading

---

[1]Plaintiff originally took a cross-appeal against defendant Cessna, but a settlement was reached and the cross-appeal was dismissed.

on the air speed indicator would be affected and that instrument would no longer be reliable.

When Robertson performed its STOL modification on the Cessna aircraft, the change in wing shape altered the air flow impacting on the pitot tube, and this affected the accuracy of the air speed indicator. In order to overcome this problem, Robertson extended the total length of the tube more than six inches, approximately doubling the length of the original Cessna pitot tube. Despite this modification, Robertson utilized the original heating element which had been developed by Cessna for use in its own shorter tube.

Plaintiff's complaint alleges that Robertson was negligent (a) in failing to properly manufacture and design the modified pitot tube; (b) in failing to test the modified pitot tube to see if it would withstand icing conditions; (c) in failing to supply sufficient heat to the modified pitot tube; and (d) in failing to warn of the above failures. The complaint also alleges that the modified aircraft was dangerous and defective because of Robertson's design and testing failures and because of Robertson's failure to warn of the dangers involved. The complaint further alleges that as a result of Robertson's negligence the modified airplane crashed and the decedent was killed.

Essentially, plaintiff's theory was that some time after crossing the Canadian border under instrument flight rules the plane encountered severe icing conditions; that the pitot tube iced up, causing the air speed indicator to fail; that other instruments for which Robertson was not responsible also failed; that the pilot became disoriented due to instrument failure; and that the plane lost altitude until it finally broke out of the clouds just before the impact. Robertson's theory was that the accident was due solely to pilot error.

Since everyone in the plane was killed, there were no witnesses to the crash and most of the evidence

produced at trial was necessarily circumstantial. The evidence produced by both sides was voluminous and often in conflict. However, since the jury returned a verdict in favor of the plaintiff and against defendant Robertson, on appeal the evidence must be considered in the light most favorable to plaintiff.

Plaintiff produced expert meteorological testimony indicating that the plane encountered a cold front some time after crossing the border and was thereafter flying through heavy clouds, continuous rain, moderate to severe turbulence, freezing temperatures and increasingly severe icing conditions. Another of plaintiff's experts testified that his laboratory tests showed that Robertson's modified pitot tube iced up under similar conditions and that the original Cessna tube did not. There was also testimony that when flying from one air mass into another, such as through a frontal system containing a large temperature differential, icing conditions could change suddenly, and the pitot tube could freeze up rapidly.

Plaintiff's evidence also indicated that the air speed indicator is a primary flight instrument and that it gives the pilot one of his main indications as to what the plane is doing. There was testimony that its use becomes critical under conditions in which the plane is picking up excessive ice over a short period of time while also encountering turbulence. There was also other testimony from which the jury could conclude that when the air speed indicator was lost under these conditions, it became dangerous to continue flying through such weather since the aircraft might stall.

There was further testimony that in order to avoid this danger a pilot could either change altitude by ascending or descending, or turn back, or, if the weather at a terminal close ahead was known to be clear, the pilot could descend toward that area. One of plaintiff's witnesses testified that when he was flying a similar Robertson-modified Cessna in icing conditions and turbulence, he lost his air speed indicator

and was forced to make a blind emergency descent to 500 feet over the ocean where he knew the air was warmer. Finally, plaintiff's expert aircraft accident reconstruction expert testified that in his opinion the crash was caused by instrument failure due to the freezing of the Robertson pitot tube and the Cessna static pressure system while the plane was encountering moderate to severe icing conditions and turbulence.

Transcripts of the plane's radio communications reveal that the pilot did not report any encounter with icing conditions and did not request permission to alter his flight plan. However, there was also testimony which indicated that in an emergency the pilot would first have to deal with the problem itself and would later notify the air controller when it became practical to do so.

■ On appeal, Robertson makes over 40 assignments and subassignments of error. Although we have considered all of these assignments, this opinion will review in detail only those assignments of error which merit any extended analysis.[2]

In its first assignment of error, Robertson contends that "[t]he circuit court erred in refusing to rule as a matter of law that plaintiff failed to prove negligence or strict liability against Robertson, and in admitting improper opinion evidence in that regard." This assignment of error is broken down into 16 subassignments of error. The first six of these subassignments relate to various actions of the trial court "in refusing

---

[2] Robertson's briefs encompass a total length of over 540 pages. Much of this length is due to Robertson's attempts to persuade this court that its own reconstruction of the facts is correct and that plaintiff's version is wrong. In an action at law this court does not attempt to weigh conflicting evidentiary matters in order to assess the ultimate accuracy of the jury's verdict. So long as that verdict is supported by any substantial, credible evidence, it cannot be overturned on appeal, and the factual issues which arose at trial are foreclosed from any further consideration. *See Krause v. Eugene Dodge, Inc.,* 265 Or 486, 509 P2d 1199 (1973); *Ray v. Anderson,* 240 Or 619, 403 P2d 372 (1965); *Denny v. Warren,* 239 Or 401, 398 P2d 123 (1964).

to rule as a matter of law that plaintiff failed to prove negligence or strict liability against Robertson."[3] The next ten subassignments of error relate to the introduction of certain evidence over Robertson's objection.[4] Essentially, Robertson's contention is that some of plaintiff's opinion evidence should not have been admitted and that, without this evidence, plaintiff's case was not sufficient to go to the jury.

Plaintiff presented expert meteorological evidence of the existence of icing conditions in the area through which the plane was flying. Plaintiff's experts were experienced in collecting, charting and interpreting weather data for aviation operations. One of these two experts had 14 years of experience interpreting weather data in the Kimberley-Cranbrook area where the crash occurred. In the past, both this court and others have recognized the propriety of utilizing meteorological data and the testimony of experts based thereon to assist the jury in determining the applicable weather conditions and the effects of those conditions. *See, e.g., Stone v. Beneficial Standard Life,* 272 Or 129, 535 P2d 764 (1975); *Gillespie Land and Irr. Co. v. Gonzalez,* 93 Ariz 152, 379 P2d 135 (1963); *Potter v. Schleck,* 9 Wis 2d 12, 100 NW2d 559 (1960).

All three meteorologists who testified in this case, including one presented by defendant Cessna, indicated that the existence of icing conditions was prob-

---

[3]The challenged actions include denials of Robertson's motions for an involuntary nonsuit and a directed verdict, failure to give Robertson's requested instructions which would have prevented the jury from finding a causal relationship between the failure of the airspeed indicator and the crash itself, the failure to strike plaintiff's specifications of negligence against Robertson, and the failure to sustain Robertson's objections to submitting the case to the jury.

[4]The challenged evidence relates to the opinions of various expert witnesses concerning meteorological conditions in the general area of the crash at the time of the accident, the adequacy of the heater employed in Robertson's elongated pitot tube to withstand icing conditions, an explanation for the pilot's failure to report icing conditions, and an expert witness's reconstruction of the events leading up to the crash and his opinion as to the ultimate cause of the crash.

able in the area through which the plane was flying shortly before the crash. The record is clear that the opinions of all three meteorologists were based upon official scientific weather observations. Plaintiff's experts testified that the plane would have encountered icing after crossing the Canadian border and that the icing would have increased in severity as the aircraft proceeded north. They established the level of icing as extending from about 8,500 feet to over 17,000 feet. Cessna's meteorologist agreed that icing was likely in this area but testified that, in his opinion, the lowest level of probable icing was 11,000 feet, with maximum icing at 14,500-15,500 feet.

■■ Robertson challenges the admissibility of plaintiff's expert meteorological testimony as to the existence of icing conditions on the grounds that these opinions contradict established fact. Apparently, Robertson feels that the absence of icing conditions is established as a matter of law by the fact that the pilot never radioed a report of any encounter with ice. Robertson argues that since the pilot was under a duty to report icing conditions, his failure to do so conclusively establishes that no icing occurred. However, plaintiff introduced testimony which indicated that in an emergency a pilot would not have time to report an encounter with icing conditions until the situation was back under control. Since there was evidence from which the jury could have concluded that the icing conditions would have presented the pilot with an emergency situation, his failure to report icing cannot conclusively establish that no icing occurred.

Robertson also argues that the ground observer at the Cranbrook station did not report icing conditions and received no reports of icing from other aircraft during the time period in question. However, plaintiff offered testimony which indicated that Cranbrook surface observations would not specifically record icing in upper altitudes but would be confined to surface readings. Moreover, the record demonstrates that the

Cranbrook observer received no reports of *any kind* from other aircraft during this period. Plaintiff also introduced the testimony of another pilot who flew over the Cranbrook area at approximately the time of the crash and who testified that as he passed the Canadian border he experienced moderate icing at his altitude of 17,000 feet and that this icing increased in severity as he continued north over the Kimberley-Cranbrook area.[5] This pilot also reported hearing the Cessna's distress beacon which was triggered by the impact of the crash.

Thus, the record clearly indicates that there was conflicting evidence as to the existence of icing conditions in the area through which the plane was flying immediately prior to the crash. Under these circumstances, the question was obviously one for the jury.

■ Robertson also assigns as error the admission of laboratory test results and expert testimony which indicated that, under weather conditions substantially similar to those which the jury could have determined were encountered prior to the crash, the Robertson pitot tube would freeze and the original Cessna tube would not. The tests were conducted at the Boeing icing tunnel in Seattle, Washington. At trial, this testimony was objected to on the grounds that there was no factual foundation to support the meteorological data upon which the expert relied in setting up and conducting the experiments. However, as the trial court concluded, there was substantial meteorological evidence in this case to support each of the underlying assumed atmospheric conditions under which the tests were run. Each of these conditions was the same as, or at least substantially similar to, the conditions under which the evidence indicates the plane was operating. Thus, the admission of this testimony and these test

---

[5]Robertson also objects to the introduction of this testimony, apparently on the grounds that this pilot was flying at a different altitude. However, the trial court cautioned the jury in this regard, and, under the circumstances involved in this case, we do not believe that this testimony was too remote to be probative.

results was well within the trial court's discretion. *See, e.g., Foster v. Agri-Chem, Inc.,* 235 Or 570, 385 P2d 184 (1963); *Loibl v. Niemi,* 214 Or 172, 327 P2d 786 (1958).

Finally, Robertson objects to the admission of the testimony of plaintiff's expert aircraft accident reconstruction analyst, Mr. Snyder. Essentially, this objection concerns the propriety of allowing an expert to base his opinions, at least in part, on the conclusions of other experts who have previously testified. Robertson contends that it was improper to allow Snyder to base any part of his conclusions as to the flight of the aircraft and the ultimate cause of the crash on the opinions of other experts, such as meteorologists and engineers.

■ It is a characteristic result of airplane crashes that the accident itself frequently kills all of the participants and destroys much of the evidence as to its cause. Under such circumstances, and in light of the frequently technical nature of the evidence which does survive, the testimony of qualified aircraft accident reconstruction analysts is an important and particularly appropriate way of assisting the jury in determining the most probable cause of the crash. *See, e.g., Ahmann v. United Air Lines, Inc.,* 313 F2d 274 (8th Cir 1963). *See also* Oregon State Bar Committee on Continuing Legal Education, Evidence § 13.34 (rev. ed. 1974). Because it will usually prove impossible for the plaintiff to produce a single expert who is qualified to express an opinion in each of the many varied technical fields which may be involved, the reconstruction analyst will normally be forced to rely, at least in part, on the opinions of other experts in the case.

This practice is in accord with the rule that is found in those jurisdictions which follow the view that Wigmore has expressed as follows:

"It is sometimes said that 'an opinion of an expert cannot be *based upon opinions expressed by other experts*'; but this is unsound. Keeping in mind that the ordinary distinction between 'fact' and 'opinion' has here

no value (*ante,* § 672, *post,* § 1919), it will be seen that the basis for a hypothetical opinion may be either data observed or data inferred, and that inferred data presented by expert testimony may equally well become a part of the basis for a hypothetical question; e.g. (as in the case cited) a fireman may testify to coal in the furnace, and a chemist may testify, hypothetically on the burning of coal, that the gas generated would be carbon monoxide, and then another expert may be asked what would be the effect of an explosion of carbon monoxide on starch dust in the oven room. There is no mysterious logical fatality in basing 'one expert opinion upon another'; it is done every day in business and in applied science." (Footnote omitted.) 2 Wigmore on Evidence 810, § 682 (3d ed 1940).

This discussion is supplemented in the 1975 pocket part which adds:

"For that matter, 'in everyday trials factual opinions or conclusions of both lay and expert witnesses are utilized in hypothetical questions.' " (Footnote omitted.) *Id.* at 333.

*See also Gillespie Land and Irr. Co. v. Gonzalez, supra; Schmidt v. Gibbons,* 3 Ariz App 147, 412 P2d 716 (1966); *Hornberger v. St. Louis Public Ser. Co.,* 353 SW2d 635 (Mo 1962); *Fowler v. Bachus,* 179 Neb 558, 139 NW2d 213 (1966); *Stanley Co. of America v. Hercules Powder Co.,* 29 NJ Super 545, 103 A2d 33 (1954); *Fitzpatrick v. Public Ser. Co.,* 101 NH 35, 131 A2d 634 (1957); *Ford Motor Co. v. Kuhbacher,* 518 P2d 1255 (Wyo 1974).

We also think it is significant that several of this court's past decisions have involved the use of expert opinions which have been based, at least in part, upon the opinion testimony of prior experts. *See, e.g., McEwen v. Ortho Pharmaceutical,* 270 Or 375, 528 P2d 522 (1974) (doctor permitted to testify that the thromboses which another physician had concluded were the probable cause of the hemorrhaging in plaintiff's eyes were "most probably" the result of the ingestion of defendants' oral contraceptives); *State Highway Com. v. Arnold et al,* 218 Or 43, 341 P2d 1089, 343 P2d

1113 (1959) (real estate appraiser permitted to testify as to probable value of a cinder cone, even though his opinion was based, at least in part, upon the conclusions of a testing laboratory as to the quality of the cinders); *Devine v. Southern Pacific Co.,* 207 Or 261, 295 P2d 201 (1956) (doctor permitted to testify as to the probable cause of decedent's lung cancer, despite the fact that his opinion was based, in part, upon the conclusions of another physician which appeared in an autopsy report).

Therefore, although this practice may be inconsistent with dicta in one of our previous cases, *Lewis v. Baker,* 243 Or 317, 413 P2d 400 (1966), we hold that it was not error to allow the expert accident reconstruction analyst in this case to base his opinion, at least in part, on the previously admitted opinions of other experts. If the jury concludes that the underlying opinions are to be accepted as a true depiction of the probable facts, there would appear to be no valid reason to prevent the jury from further determining that the conclusions of another expert which are based on those probable facts are also probably true.[6]

In its second assignment of error, Robertson argues that the trial court erred in refusing to enter a judgment in favor of Robertson on the basis of "the inconsistent and unlawful jury verdict." Robertson contends that the jury's verdict which found against Robertson but in favor of the other defendant, Cessna, is necessarily an inconsistent verdict, and that Robertson's motions for a directed verdict and a judgment n.o.v. should have been granted.

The jury's verdict would be necessarily inconsistent only if there were no separate grounds upon which to

[6] No doubt, under some circumstances, the chain of "probable" facts may become so attenuated that an expert's opinion which assumes the actual existence of each of those facts will retain little probative value. In such a case the trial court may, depending on the particular circumstances, either exclude the expert's testimony or issue a cautionary instruction to the jury. However, despite Robertson's protestations to the contrary, we do not believe that this case falls into that category.

find Robertson liable while exonerating Cessna. *Kraft v. Montgomery Ward & Co., Inc.,* 220 Or 230, 251-52, 315 P2d 558, 348 P2d 239, 92 ALR2d 1 (1960). Therefore, if in this case there is *any* theory under which the jury could have found Robertson legally responsible for the accident while exonerating Cessna, the verdict was not unlawful.

There was evidence from which the jury could have determined that the cause of the crash was instrument failure and pilot disorientation due to the freezing of the Robertson pitot tube and the Cessna static pressure system and that the failure of each was a substantial factor in causing the accident. The jury could then have concluded that plaintiff failed to show that Cessna was negligent in designing and testing its static pressure system, but that plaintiff did prove that Robertson was negligent in designing and testing the elongated pitot tube. Alternatively, the jury could have concluded that plaintiff's proof failed to show negligence on the part of either defendant, but that plaintiff did prove her products liability claim against Robertson. No products liability claim against Cessna was submitted to the jury.[7] Finally, the jury could have determined that plaintiff proved that the Robertson pitot tube froze due to a defective heater, but that plaintiff failed to carry her burden of proof as to the freezing of the Cessna static pressure system. There was evidence from which the jury could then have concluded that the freezing of the pitot tube and the consequent loss of the air speed indicator forced the pilot to deviate from his assigned altitude in an attempt to restore the functioning of the air speed indicator and that this deviation resulted in the crash.

If any one of these three theories was adopted by the jury, then the verdict which they returned was not

---

[7] On Cessna's motion, and over plaintiff's objection, the trial court dismissed plaintiff's strict liability claim against Cessna as barred by the Kansas statute of limitations. This action may well have been in error. *See Forsyth v. Cessna Aircraft Co.,* 520 F2d 608, 612 (9th Cir 1975) and cases cited therein.

inconsistent. Consequently, we cannot say that the verdict in this case was necessarily inconsistent, and, therefore, the verdict was not unlawful.

Robertson's third assignment of error contends that the trial court erred in overruling Robertson's demurrer to plaintiff's complaint. In its demurrer, Robertson took the position that plaintiff's cause of action was precluded by the running of the one-year British Columbia statute of limitations on wrongful death actions.

Both parties recognize that the applicable test for resolving choice of law questions in this jurisdiction is that set forth in *Casey v. Manson Constr. Co.,* 247 Or 274, 428 P2d 898 (1967), which adopts the "most significant relationship" approach embodied in Restatement (Second) Conflict of Law (1971). *See also Erwin v. Thomas,* 264 Or 454, 506 P2d 494 (1973); *DeFoor v. Lematta,* 249 Or 116, 437 P2d 107 (1968).

Section 142 of the Restatement discusses the general effect of statutes of limitations conflicts and provides, in part, as follows:

> "(2) An action will be maintained if it is not barred by the statute of limitations of the forum, even though it would be barred by the statute of limitations of another state, except as stated in § 143."

Section 143, in turn, provides that:

> "An action will not be entertained in another state if it is barred in the state of the otherwise applicable law by a statute of limitations which bars the right and not merely the remedy."

Thus, under the Restatement approach, an action will be barred by the statute of limitations of a non-forum jurisdiction only if that jurisdiction is the state of the otherwise applicable law and the statute in that state bars the right as well as the remedy.

Section 175 of the Restatement provides that the state of the applicable law in wrongful death cases is the state in which the injury occurred, unless some

other state has a more significant relationship to the accident and to the parties. If some other state does have a more significant relationship, the laws of that state provide the applicable law. *See* Restatement (Second), supra, § 175:

> "In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied."

The jurisdiction in which the injury occurred is British Columbia. The only other two jurisdictions involved with the occurrence and with these two parties are Washington, where Robertson is incorporated and has its principal place of business and where it performed the STOL modification, and Oregon, where the decedent and his family resided, where the fatal round-trip flight originated and was to have terminated, and where the aircraft was owned and chartered. Both Washington and Oregon have three-year statutes of limitations on wrongful death actions.[8] Since there is no conflict between the law of Oregon and that of Washington with regard to this issue, the contacts with these two states should be considered jointly when determining whether to apply the law of Oregon, the place of the forum, or the law of British Columbia, the place of the injury. *See* Restatement (Second), supra, § 145, comment *i.*

Viewed in this light, the case is closely parallel to *DeFoor v. Lematta, supra,* in which this court concluded that the Oregon wrongful death statute should be applied to an action between two Oregon domiciliaries arising out of a helicopter crash in California. In *DeFoor,* we noted that:

> "* * * a defendant cannot reasonably complain when compensatory damages are assessed in accordance with the law of his domicile, and a plaintiff cannot reasonably

---

[8] See ORS 30.020(1); R.C.W. 4.16.080(2).

complain when the award is the same as it would have been had the injury occurred at home. Under all the circumstances of this case, the interests of the state of Oregon in providing for recovery against its citizens of damages for the wrongful death of its citizens are fully served by applying the Oregon wrongful-death law, and no significant interest of the state of California is in any way offended." 249 Or at 121-22.

█  As between Oregon/Washington and British Columbia, the only relationship which British Columbia has to this action is the entirely fortuitous event that it happened to be the site of the crash. British Columbia could, therefore, have no substantial interest in having its statute of limitations prevent the maintenance of this action. Thus, the trial court did not err in applying Oregon law. *See also* Restatement (Second), supra, § 175, comment *f.*

Robertson's fourth assignment of error concerns two of the trial court's evidentiary rulings. The first relates to the trial court's exclusion of two statements in the official report of this accident which was prepared by the Canadian Department of Transportation. The second involves the court's refusal to admit portions of the deposition of two Canadian officials who investigated the accident and prepared the preliminary report upon which the official report was based. The excluded portions of the deposition relate to the excluded statements in the official report. The excluded portions of both documents were offered by Robertson over plaintiff's objection.

The first excised portion of the official Canadian accident report appeared under the heading, "Description of the Occurrence":

"The pilot had very limited experience in instrument flight and had logged only 1½ hours instrument time in the preceding 90 days."

The second excluded portion of this report was under the heading, "Assigned Cause[s]":

"For undetermined reasons the pilot descended below

the safe minimum altitude for the area while attempting a non-standard instrument approach procedure."

■ In our opinion, the trial court did not err in excluding the above portions of the Department of Transportation's official report. The record indicates that the statement concerning the pilot's "limited" instrument flight experience was a conclusion which was drawn by the investigators from a "flight history" which was apparently supplied to them by the pilot's employer. The excised portions of their deposition make it clear that the investigators did not know the source of the information upon which this "flight history" was based. As such, it was an observation which was based upon hearsay alone. Since the factual portion of the statement—referring to the hours of instrument time which the pilot had logged in the preceding 90 days— was already in evidence through another source, we do not believe that the court abused its discretion in excluding the entire statement. *See Wynn v. Sundquist,* 259 Or 125, 133, 485 P2d 1085 (1971); *Miller v. Lillard,* 228 Or 202, 211-12, 364 P2d 766 (1961).

■ The second statement excluded from the report, relating to the pilot's descent below the minimum safe altitude, was also properly exluded. The investigators' deposition clearly demonstrates that this conclusion was not taken from the investigators' own report to their agency, but was the conclusion of some unspecified "headquarters personnel." "It is the cause assigned by our headquarters." Since the excised material was clearly hearsay and no foundation was laid at trial for its introduction under any exception to the hearsay rule, the trial court did not abuse its discretion in refusing to admit this part of the report. *See Wynn v. Sundquist, supra; Finchum v. Lyons,* 247 Or 255, 263, 428 P2d 890 (1967). Moreover, the record indicates that official reports such as this one are not admissible in Canadian courts and, by statute, similar material in reports prepared by American officials is also not admissible. *See, e.g., American Airlines, Inc. v. United States,* 418 F2d 180 (5th Cir 1969); *Berguido v.*

*Eastern Air Lines, Inc.,* 317 F2d 628 (3d Cir 1963); *Israel v. United States,* 247 F2d 426 (2d Cir 1957).

■ Similarly, we do not believe that the court erred in excluding portions of the investigators' deposition. The excluded material in the deposition discussed and explained those statements in the official report which were excluded at trial. Since the underlying material was not admissible, we do not feel that the trial court abused its discretion in excluding those portions of the investigators' deposition which described that material.

■ Robertson's fifth assignment of error challenges the trial court's action in excluding one of Robertson's exhibits. The exhibit was offered at the end of the trial, and it sets forth the testimony of one of the Canadian investigators at a Canadian coroner's inquest. This investigator's deposition had already been admitted, and his deposition covers essentially the same ground that was explored in Robertson's exhibit.

Both at trial and on appeal, Robertson admitted that this exhibit was "cumulative to some extent." In offering the exhibit at trial, Robertson stated that: "It merely sets out what he found at the scene * * *, and it clarifies some of his statements and testimony in my opinion that was taken by deposition. That is all." On appeal, however, Robertson argues that the exhibit "did contain new facts, as well as illuminating and amplifying certain facts not wholly explored in the present record" and that its exclusion by the trial court was "unjustified, unreasonable, prejudicial, and provides yet another instance of uneven treatment of the defendant."

At trial, Robertson did not point out any new material in the exhibit which was not already in evidence through the deposition. Even on appeal, Robertson argues primarily that the exhibit "broadens," "elaborates upon" and "clarifies" the investigators' deposition testimony. The only new evidence which Robert-

son contends is contained in the exhibit is (a) evidence of a standard Airworthiness Certificate issued for the aircraft; (b) evidence of an annual inspection a month prior to the crash; (c) evidence of the suggested transitional route for the plane; and (d) additional evidence as to the location of the crash site and the extent of the debris. In our view, none of this additional evidence is substantial enough to warrant reversal of this case even if it had been pointed out to the trial court at the time the exhibit was offered and excluded—which it was not. Moreover, our own review of the exhibit discloses no other evidence which was not thoroughly covered in the deposition. Under these circumstances, we do not believe that the court's action in excluding this exhibit was either "unjustified, unreasonable, [or] prejudicial." *See, e.g., Burnham v. Eshleman,* 257 Or 400, 479 P2d 501 (1971); *Jackson v. Sharff,* 1 Or 246 (1859).

Defendant's sixth assignment of error concerns the propriety of the trial court's action in striking a portion of the opinion testimony of defendant's expert witness, Mr. Jensen. The only portion of Jensen's testimony which was stricken was his response to a hypothetical question concerning his opinion as to the probable cause of the crash. Jensen's answer was stricken by the court, following an attack on Jensen's credentials during plaintiff's cross-examination, on the grounds that he was not qualified as an accident reconstruction analyst. On appeal defendant contends, first, that Jensen was adequately qualified to express an opinion as to the cause of the crash, and, second, that even if Jensen did not qualify as an expert in this area, plaintiff's motion to strike was untimely and should not have been granted.

Whether an expert witness has been shown to be adequately qualified to express an opinion on a particular subject is ordinarily a matter lying within the discretion of the trial court, and, on appeal, his decision will be reversed only for an abuse of that discretion. *Yundt v. D & D Bowl, Inc.,* 259 Or 247, 256, 486

P2d 553 (1971). *See also Wulff v. Sprouse-Reitz Co., Inc.,* 262 Or 293, 498 P2d 766 (1972); *Denny v. Warren,* 239 Or 401, 398 P2d 123 (1964); *State Highway Com. v. Arnold et al,* 218 Or 43, 341 P2d 1089, 343 P2d 1113 (1959). Defendant's brief acknowledges this rule but goes on to assert that:

> "No objective observer can characterize Judge Roth's ruling as anything other than a blatant, outrageous, and manifest abuse of discretion, one which unfairly tipped the balanced scales of justice in the plaintiff's favor by eliminating the defense [sic] theory of causation."

We cannot agree with this characterization of the trial court's ruling.[9]

It is universally conceded that possession of the requisite qualifications to give an opinion on a particular matter must be expressly shown by the party offering that expert's testimony. 2 Wigmore on Evidence 640-41, § 560 (3d ed 1940). In this case, defendant introduced no evidence which would indicate that Jensen had any experience in investigating aircraft accidents except insofar as mechanical or engineering matters might be at issue. While there was evidence that Jensen had previously testified as an "aircraft accident expert" in several other jurisdictions and was a member of the Society of Air Safety Investigators," the record does not show that either his training or experience extended beyond the merely technical, engineering aspects of accident investigations. Moreover, during plaintiff's cross-examination it was disclosed that Jensen had no formal training as an accident investigator, had never attended a seminar on that subject, was not an aeronautical engineer, was not accredited as an instrument flight pilot, did not have a current pilot's license, and had never flown a light aircraft similar to the one involved in this

---

[9]We also note in Robertson's brief other inappropriate references to plaintiff's counsel and plaintiff's witnesses. References such as these have no place in a brief and are of no assistance to this court in attempting to solve the legal issues presented in an appeal.

crash.[10] Following this cross-examination, the court ruled that Jensen was not adequately qualified to express an opinion as an expert accident reconstruction analyst and struck his answer to defendant's hypothetical.

No expert is competent to express an opinion on every subject. As Wigmore states:

> "The capacity is *in every case a relative one,* i.e., relative *to the topic about which the person is asked to make his statement.* The object is to be sure that the question to the witness will be answered by a person who is fitted to answer it. His fitness, then, is a fitness to answer on that point. He may be fitted to answer about countless other matters, but that does not justify accepting his views in the matter in hand. * * * A person may be sufficiently skilled upon one question, and totally unskilled upon the next." 2 Wigmore on Evidence 634, § 555 (3d ed 1940).

*Accord, Meyer v. Harvey Aluminum,* 263 Or 487, 501 P2d 795 (1972). Although Jensen's education in mechanical engineering and his experience in "providing technical assistance when needed in aircraft accidents" undoubtedly qualified him to testify on other matters, we do not believe that the trial court abused its discretion in concluding that Robertson had not shown that its expert was qualified to express an opinion as to the probable cause of the crash on the basis of this expertise "in the science of aircraft accident reconstruction."

Similarly, we conclude that the trial court did not err in allowing plaintiff's motion to strike Jensen's answer to the hypothetical despite Robertson's contention that plaintiff's motion was not timely. Before Jensen's answer had been given, plaintiff objected on the basis that the witness was "not qualified." The objection was overruled at that time, but plaintiff was granted a continuing objection "to his whole opinion." Moreover, on two different occasions prior to the

---

[10] Although the record is unclear, it does not appear that Jensen has had any flying time in any aircraft since leaving active duty with the air force shortly after World War II.

answer which was stricken, plaintiff sought to test Jensen's qualifications "in aid of an objection." However, the court did not allow such an inquiry at that time. Following his attack on Jensen's qualifications during cross-examination, plaintiff's counsel asked leave to proceed while retaining the right to present his objections to the court later. Permission was granted, and, as the court later indicated, "it was obvious [that plaintiff was] going to move to strike." However, defendant now argues that plaintiff's motion to strike was untimely since the motion itself was not actually made until after both parties had rested and defendants had moved for a directed verdict.

Mr. Jensen was Robertson's last witness. Immediately after his testimony was over, the court took a recess. When the court returned, the defendants rested and plaintiff rested. Next, plaintiff and both defendants each notified the court that they had motions to present. The court chose to hear the defendants' motions first. When plaintiff's turn came, plaintiff's counsel first moved to strike Jensen's testimony and then moved for a directed verdict. After much discussion on the various motions, the court ruled that Jensen was not adequately qualified and struck his opinion as to the cause of the crash. Under these circumstances, we do not believe that plaintiff's motion to strike was untimely.

Robertson's seventh assignment of error challenges the trial court's actions in admitting two of plaintiff's exhibits over Robertson's objection and then later withdrawing these exhibits on its own motion, while at the same time rejecting an exhibit which Robertson had offered in response to plaintiff's exhibits. Robertson argues that the trial court erred in admitting plaintiff's exhibits and erred in excluding Robertson's.

Plaintiff's exhibits were two letters, one from plaintiff's witness, Saunders, to Robertson, and one from Robertson to Saunders in response. Both of these let-

ters concern Saunders' complaints to Robertson relating to the functioning of the pitot tube in his modified Cessna and the loss of indicated airspeed under icing conditions. Saunders' letter to Robertson describes the seriousness and frequency of the problem, notes that he had brought it to Robertson's attention on several prior occasions, and reports Saunders' conclusion that the lengthened pitot tube was the source of the malfunction. Robertson's response to Saunders appears to acknowledge the problem with the pitot tube, states that Robertson had "just about completed the redesign of our pitot tube installation" and offers to replace Saunders' old pitot tube "with a newly designed one." Robertson's letter also thanks Saunders for writing a letter to a Mr. Kamm endorsing the Robertson STOL modification. Robertson objected to the admission of both of these letters, but the objection was overruled.

■ Assuming that the trial court erred in admitting these letters as exhibits, we do not believe that that error requires a reversal of this case. The record discloses that these letters were never read to the jury and were withdrawn from evidence on the court's own motion before the end of the trial. The judge then issued a cautionary instruction to the jury to insure that neither side would be prejudiced by his actions. Under such circumstances, any error would appear to have been harmless.

■■ Robertson also objects to the court's refusal to admit an exhibit which Robertson had produced in response to plaintiff's letters. This exhibit was a copy of the Saunders letter to Kamm which had been referred to in one of the letters which plaintiff had introduced. The letter was an endorsement of Robertson's STOL modification and was offered, presumably as a prior inconsistent statement, for purposes of impeaching Saunders' credibility concerning his complaints to Robertson about the failure of the pitot tube to withstand icing conditions. Under ORS 45.610, such evidence can be introduced only after a proper foundation has been laid. Assuming that Saunders' general

endorsement of the STOL modification is at least somewhat inconsistent with his specific complaints about pitot tube icing, we do not find any foundation in the record for the admission of such evidence. Therefore, we conclude that it was not error to refuse to admit it on that basis. *See State v. Dowell,* 274 Or 547, 547 P2d 619 (1976); McCormick on Evidence 80-81, § 40 (2d ed 1972).

Since the court eventually excluded plaintiff's letters, we also conclude that the court did not err in refusing to admit Robertson's exhibit under the "part/whole" exception to the hearsay rule. The other "parts" were no longer in evidence, and, therefore, that exception became inapplicable. Similarly, even if Robertson's exhibit would otherwise qualify as a "Business Record," we do not believe that the court abused its discretion in refusing to admit it in this case. The letter was an unsigned, unauthenticated copy of a typewritten document. The witness through whom Robertson attempted to offer the exhibit admitted that he had not received the document himself and indicated that it had been found in the office files by another Robertson employee. Moreover, the relevancy of the exhibit was marginal at best. Under these circumstances, we find no abuse of discretion. *See* ORS 41.690.

In its eighth assignment of error, Robertson contends that the trial court erred in failing to sustain Robertson's objections and motions which were directed against the testimony of plaintiff's economist, Mr. O'Bannon. O'Bannon is an economics professor who testified as to the probable future earning capacity of the decedent as reduced to its present value. He set this figure at $1,336,792. He then computed the average percentage of such income which would have been spent on the surviving family members. On the basis of these figures and computations, he set the present value of the family's pecuniary loss at $801,561 to $836,260, depending on the age to which the children were supported.

First, Robertson objected to this testimony as "invading the province of the Jury, uncertain, speculative, and unreliable." This objection was not well taken. *See Plourd v. Southern Pac. Transp. Co.,* 266 Or 666, 513 P2d 1140 (1973); *Osborne v. Bessonette/Medford Mtrs.,* 265 Or 224, 508 P2d 185 (1973). Second, after it was disclosed on cross-examination that the economist had not considered the effect of taxation in establishing the decedent's earning capacity and in computing its present value, Robertson moved to strike plaintiff's allegation of damages on the basis that O'Bannon's figures did not take into account the effect of taxation. Robertson, however, did not move to strike the economist's testimony on this basis, but only moved against the allegations in the complaint. This failing alone would be a sufficient basis for the resolution of this issue.

However, assuming, but without deciding, that evidence concerning the effect of income taxes on projected earnings was relevant, we do not believe that, as a matter of law, plaintiff had an affirmative duty to produce such evidence through her own economist. On cross-examination, Robertson took the opportunity to expose O'Bannon's failure to consider the impact of taxation, and Robertson brought the issue up again during closing arguments. If Robertson had wished to pursue the matter further, it could have called its own economist to testify. *See Burlington Northern, Inc. v. Boxberger,* 529 F2d 284 (9th Cir 1975); Annot., 63 ALR2d 1393 (1959). *Cf. Plourd v. Southern Pac. Transp. Co., supra* at 680-81. In any event, we fail to see that Robertson was unfairly prejudiced by any omission in this respect. The jury apparently heeded Robertson's criticism of the economist's testimony since plaintiff was awarded substantially less than O'Bannon had projected.

In its ninth assignment of error, Robertson asserts that the trial court erred in failing to strike plaintiff's strict liability count against Robertson. Robertson

argues that plaintiff failed to plead and prove that the aircraft, as modified, was in an "unreasonably dangerous" condition. Plaintiff's complaint does not employ the term "unreasonably" but alleges that the aircraft "was dangerous and was defective."

We do not believe that plaintiff's allegation was deficient merely because it did not contain the word "unreasonably." In our recent opinions, this court has used the phrases "unreasonably dangerous" and "dangerously defective" interchangeably. *See, e.g., Phillips v. Kimwood Machine Co.,* 269 Or 485, 491 n.3, 525 P2d 1033 (1974). At least under the circumstances of this case, we do not believe that plaintiff's allegation that the aircraft "was dangerous and was defective" is meaningfully different from the phraseology employed either in our past decisions or in § 402 of the Restatement (Second) of Torts (1965). *Compare Brown v. Western Farmers Assoc.,* 268 Or 470, 478, 521 P2d 537 (1974), *with Spears v. Huddleston,* 265 Or 168, 174-75, 508 P2d 438 (1973), *and Western Feed Co. v. Heidloff,* 230 Or 324, 343, 370 P2d 612 (1962). Nor do we believe that either the jury, the court, or any of the parties could have been misled by the language employed in the complaint.

Robertson also contends that "a reasonable jury could not conclude that the Robertson modification rendered the aircraft 'unreasonably dangerous.' " Robertson reasons that since the pitot tube heater was only optional equipment anyway, any failure of this heating system as a result of a design defect could not, as a matter of law, represent an unreasonably dangerous condition.

We fail to see how the optional character of the defective item necessarily precludes a finding that the defect rendered the product unreasonably dangerous. Whether the issue is viewed in terms of the consumer-oriented products liability test of the Restatement (Second) of Torts, § 402A, comment *i* (1965)—which was the test employed by the trial court in instructing

the jury—or in terms of the manufacturer-oriented test adopted in *Phillips v. Kimwood, supra,* and *Roach v. Kononen/Ford Motor Co.,* 269 Or 457, 465, 525 P2d 125 (1974), the result in this case should be the same. Under the evidence in this case, a reasonable jury could conclude that, as a result of the elongated Robertson pitot tube and its inadequate heater, the modified Cessna was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." Restatement, supra, § 402A, comment *i.* Similarly, on the basis of the evidence in this case, a reasonable jury could also conclude that "assuming that the defendant had knowledge of the condition of the product, [he would] then have been acting unreasonably in placing it on the market." *Roach v. Kononen/Ford Motor Co., supra* at 464. Therefore, we find that the trial court did not err in refusing to strike plaintiff's products liability count against Robertson.

We have also reviewed Robertson's remaining 15 assignments and subassignments of error and find them to be without merit. Eleven of these remaining assignments involve the giving of two instructions over Robertson's objection and the trial court's refusal to give eight other instructions which Robertson had requested.

One of the two challenged instructions which were given relates to the feasibility of a different pitot tube arrangement so as to avoid the problem with the heater. Robertson objected to this instruction on the grounds that "the evidence in the case does not warrant such an instruction. It's improper, prejudicial, and very inflammatory." The feasibility of a different pitot tube design and its compatibility with the STOL modification was properly an issue in this case. *See Fulbright v. Klamath Gas Co.,* 271 Or 449, 533 P2d 316 (1975); *Phillips v. Kimwood Machine Co., supra; Roach v. Kononen/Ford Motor Co., supra. See also Hoppe v. Midwest Conveyor Co., Inc.,* 485 F2d 1196

(8th Cir 1973); *Boeing Airplane Co. v. Brown,* 291 F2d 310 (9th Cir 1961); Note, *Products Liability and Evidence of Subsequent Repairs,* 1972 Duke L J 837 (1972). Moreover, in this case, no objection was made to the evidence of the subsequent design change when the evidence was introduced. Since the challenged instruction told the jury that such evidence was relevant only to feasibility and since there was evidence in the case to support the instruction, the objection made at trial was not well taken.[11]

■ The other challenged instruction concerns the applicability of certain FAA regulations which impose a statutory duty on "each person" who performs alterations on aircraft. *See* 14 C.F.R. § 43.13 (1976). Robertson contends that the word "person" as used in the regulation refers only to the individual mechanic who actually performs the modification. That argument overlooks the broad statutory definition contained in 14 C.F.R. § 1.1 (1976):

> " 'Person' means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity."

We find no error in the instruction as given.

■ We also find no error in the court's refusal to give eight of Robertson's requested instructions. These eight requested instructions were either enlargements upon and duplications of instructions which were given, or were actually inaccurate and misleading. None of the requested instructions which were accurate related to an essential element of Robertson's theory of this case which was not adequately covered by a comparable instruction which was given. Therefore, we do not believe the trial court abused its discretion in failing to give these requested instructions. *See*

---

[11]The instruction did not limit the evidence of the feasibility of the different design to the products liability issue. However, no objection was made on that ground and no limiting instruction was requested. Under such circumstances, any question as to the relevancy of the evidence of subsequent change to the negligence issue is not properly before us. *See Miller v. Lillard,* 228 Or 202, 364 P2d 766 (1961).

*Ireland v. Mitchell,* 226 Or 286, 294-95, 359 P2d 894 (1961); *Nordlund v. Lewis & Clark Ry. Co.,* 141 Or 83, 92, 15 P2d 980 (1932). *See also Denton v. Arnstein,* 197 Or 28, 54, 250 P2d 407 (1952).

■ Of the four remaining assignments of error, one involves the court's refusal to grant a mistrial on the basis of allegedly improper argument by plaintiff's counsel in his opening and closing statements. The argument related to the feasibility of a different pitot tube design and was within the bounds of the issues and evidence in this case.

■ Another assignment of error relates to a similar refusal to grant a mistrial on the grounds of an allegedly improper comment by plaintiff's counsel in his opening statement concerning the fact that plaintiff had settled her case against the pilot's employer within the policy limits of its insurance contract because the employer had gone into bankruptcy. Robertson, however, had insisted, over plaintiff's objection, that the amount of the settlement should be introduced, and the record clearly shows that Robertson specifically agreed that the covenant not to sue should itself be admitted. The terms of the covenant not to sue recite the same facts that plaintiff's counsel brought to the jury's attention when explaining the prior settlement in his opening statement. Under these circumstances, we find no error in refusing to grant a mistrial.

■ Robertson also objects because plaintiff was allowed to amend her complaint, after both sides had rested, to substitute the phrase "inadvertent icing conditions" for the phrase "normal icing conditions." In our view, the change was an immaterial amendment to conform to the evidence which was introduced at trial. Although the plane was not designed to fly into known icing conditions, the evidence indicated that it was normal to encounter icing conditions inadvertently. Since the alteration did not substantially change the cause of action, allowance of the amend-

ment was within the trial court's discretion. *See, e.g., Morrill v. Rountree,* 242 Or 320, 324-25, 408 P2d 932 (1966).

■■ Finally, Robertson contends that the trial court committed reversible error in refusing to employ special interrogatories to determine the relative liability of each defendant. Normally, this is a matter within the realm of the trial court's discretion. *See* ORS 17.415. Moreover, in this case we fail to see how Robertson could have been prejudiced by a failure to employ special interrogatories since the jury necessarily determined that Robertson was the only defendant liable for the crash.

Affirmed.